Joan P. WHITAKER and Barbara V. Leezer, Guardians Ad Litem for Caroline Monaghan, Appellees

v.

The FRANKFORD HOSPITAL OF the CITY OF PHILADELPHIA d/b/a Frankford Hospital–Frankford, The Frankford Hospital of the City of Philadelphia d/b/a Frankford Hospital–Torresdale, Robert T. Smith, M.D., Harold J. Gauthier, M.D. and Diagnostic Imaging, Inc.,

Appeal of Robert T. Smith, M.D., Appellant.

Caroline Monaghan, Appellee

v.

Frankford Hospital, Frankford Division, Frankford Hospital, Torresdale Division, Carl S. Rubin, D.O., Medical Imaging Associates, Hospital Medical Imaging, Inc., Robert T. Smith, M.D., Northeast Philadelphia Vascular Surgeons, P.C., Farouq A. Samhouri, M.D., Harold J. Gauthier, M.D., ABC Emergency Room Services Corp., Michael J. Rosner, M.D., Joseph Nabong, M.D., Neurocare Diagnostics, Inc., and Randy M. Rosenberg, M.D.,

Appeal of Diagnostic Imaging, Inc., Appellant.

Superior Court of Pennsylvania.

Argued Feb. 24, 2009.
Filed Nov. 12, 2009.

Naomi A. Plakins, Doylestown, for Smith.

James E. Kurack, Jr., Philadelphia, for Diagnostic Imaging, Inc.

Charles L. Becker, Philadelphia, for Whitaker, Leezer and Monaghan, appellees.

BEFORE: ORIE MELVIN, BOWES, and DONOHUE, JJ.

OPINION BY BOWES, J.:

¶ 1 Appellants, Diagnostic Imaging, Inc. and its agent Dr. Robert T. Smith, appeal from the judgment entered on a jury verdict in this medical malpractice action. The verdict was entered in favor of the plaintiffs, Appellees Joan P. Whitaker and Barbara V. Leezer, in their capacity as guardians *ad litem* for Caroline Monaghan. The jury determined that Dr. Smith and Dr. Harold J. Gauthier, who had previously settled with Appellees, were equally responsible for causing the injuries at issue in this case, and it awarded $5,200,000 in damages. After careful review of the record and the arguments presented on appeal, we affirm.

¶ 2 To begin our appellate review, we set forth the trial evidence viewed in the light most favorable to Appellees as verdict winners. In May 2001, Ms. Monaghan was seen by her primary care physician, whose examination revealed the possibility that she had a stenosis, also known as blockage, in her carotid arteries. It is well established that blockage of the carotid arteries creates a risk of a stroke, which results from a restriction of blood flow to the brain; eighty percent of strokes are caused by blockage to the arteries that supply blood to that organ. The carotid and vertebral arteries are the blood vessels that carry the blood from the heart to the brain, and the longer the blood supply to the brain is restricted, the more severely the brain is damaged.

¶ 3 On June 11, 2001, Ms. Monaghan underwent an ultrasound of the carotid arteries to determine whether she had blockage. That ultrasound was interpreted by doctor of osteopathy Carol S. Rubin, who opined that Ms. Monaghan displayed "bilateral soft plaque with 70 plus percent critical left ICA [interior carotid artery] stenosis." N.T. Trial (Jury) Vol. 1, 9/27/04, at 50. This report indicated that Ms. Monaghan had at least seventy percent blockage in her left internal carotid artery. Ms. Monaghan was immediately referred to

vascular surgeon Farouq A. Samhouri, who ordered an MRA/MRI study of her neck arteries. That MRA/MRI was performed on June 20, 2001, at Diagnostic Imaging, Inc., and it was interpreted by Dr. Smith. Dr. Smith concluded that the MRA/MRI study demonstrated that Ms. Monaghan's proximal left internal carotid artery had fifty percent blockage and that her common carotid left artery had the same percentage of stenosis.

¶ 4 A carotid artery with fifty percent blockage is treated with monitoring and aspirin therapy. However, if a diagnostic study reveals the existence of seventy percent blockage, there is no way to discern whether the blockage is seventy percent or higher. Thus, the actual degree of stenosis can be as high as ninety-nine percent. Any blockage of seventy percent is critical and calls for surgical intervention. Based on the discrepancy between the ultrasound, which indicated critical blockage, and the MRA/MRI, which called for drug treatment and monitoring, Dr. Samhouri ordered another study to determine which result was correct.

¶ 5 A patient with seventy percent blockage who is asymptomatic does not require emergent treatment. Dr. Samhouri confirmed that he would have performed surgery on the arteries in the event the blockage was seventy percent or more. However, he would not have been able to schedule that surgery until after June 23, 2001. A patient with seventy percent stenosis who is exhibiting symptoms of a stroke requires immediate hospitalization and treatment with intravenous drug therapy.

¶ 6 On the afternoon of June 23, 2001, Ms. Monaghan went to the emergency room of Frankford Hospital, complaining that she had difficulty picking up objects and was experiencing tingling and numbness in her arm. These symptoms, diffi-culty moving, numbness and tingling, rendered Ms. Monaghan symptomatic.

¶ 7 At the hospital, Ms. Monaghan was treated by Dr. Gauthier. By the time Dr. Gauthier examined Ms. Monaghan, the weakness and loss of sensation in her extremities had resolved. Joan Whitaker, Ms. Monaghan's daughter, informed Dr. Gauthier about the results of both the ultrasound and the MRA/MRI. Dr. Gauthier concluded that Ms. Monaghan had suffered a transient ischemic attack ("TIA") and relying upon the results of the MRA/MRI indicating that she had non-critical stenosis, discharged her at 8:00 p.m. on June 23, 2001. Ms. Monaghan returned to Frankford Hospital at 10:30 p.m.; she had suffered a massive stroke causing severe brain damage.

¶ 8 Appellees instituted this medical malpractice action against numerous physicians and health care facilities. Prior to trial, some defendants were dismissed, and Dr. Gauthier and Frankford Hospital settled with Appellees for $2,600,000. Dr. Gauthier remained a defendant at trial for purposes of apportioning liability. Appellees presented evidence that Dr. Smith had misinterpreted the June 20, 2001 MRA/MRI which clearly revealed that Ms. Monaghan had over seventy percent blockage in her two arteries, as indicated in the June 11, 2001 ultrasound. Appellees also presented evidence that the occurrence of a TIA means that a person with critical stenosis is symptomatic and in need of immediate treatment and that Dr. Gauthier discharged Ms. Monaghan rather than admit her for treatment because he believed that she had non-critical stenosis based upon the MRI study. Finally, Appellees established that had their mother been admitted to Frankford Hospital during the afternoon of June 23, 2001, and treated with Heparin, there was at least a ninety-five percent chance that she would

not have suffered the massive stroke that resulted in her severe disability.

¶ 9 The jury determined that Dr. Smith and Dr. Gauthier were equally responsible for Ms. Monaghan's injuries and awarded $5,200,000 in damages. The verdict was molded to reflect the apportionment of liability, and these timely appeals by Diagnostic Imaging, Inc. and Dr. Smith followed.

¶ 10 Appellants present identical arguments on appeal that are framed with slight differences. Their averments can be summarized as follows. Appellants' first position is that they should have been granted either summary judgment or a compulsory nonsuit because Appellees failed to establish that their conduct caused Ms. Monaghan's injuries. There are two aspects to this first issue. Appellants claim both that there was no evidence that Dr. Samhouri would have performed vascular surgery before June 20, 2001, when Ms. Monaghan suffered her stroke, and that there was no evidence that Dr. Gauthier relied upon Dr. Smith's incorrect interpretation of the June 20, 2001 MRA/MRI report when he decided to discharge Ms. Monaghan on June 23, 2001. Next, Appellants complain that Appellees' two expert witnesses, one of whom was a standard-of-care expert witness and the other of whom was a causation expert witness, were improperly permitted to testify about the area of expertise of the other. In addition, Appellants maintain that their expert witness was incorrectly restricted during his direct examination. Finally, Appellants request remittitur of the verdict on the basis of excessiveness.

¶ 11 Before addressing the merits of their first issue, we note that Appellants have incorrectly framed their position. Once this case proceeded to trial and Appellants presented a defense, the trial court's refusal to grant them summary judgment and a compulsory nonsuit became moot. *See Gbur v. Golio,* 932 A.2d 203 (Pa.Super.2007); *Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.,* 933 A.2d 664, 668 (Pa.Super.2007). Once a jury verdict in favor of Appellees was entered, the issue became whether the trial court erred in failing to grant them judgment notwithstanding the verdict. *Gbur, supra; Northeast Fence & Iron Works, Inc., supra.* We will address Appellants' argument in the proper context. *Gbur, supra.* Our standard of review is as follows:

> [T]he standard of review for an order granting or denying judgment notwithstanding the verdict is whether there was sufficient competent evidence to sustain the verdict. We must view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. Furthermore, judgment n.o.v. should be entered only in a clear case, where the evidence is such that no reasonable minds could disagree that the moving party is entitled to relief. Review of the denial of judgment n.o.v. has two parts, one factual and one legal:
>
>> Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded evidence at trial, we will not substitute our judgment for that of the finder of fact.

*Underwood ex rel. Underwood v. Wind,* 954 A.2d 1199, 1206 (Pa.Super.2008) (quoting *Northeast Fence & Iron Works, Inc., supra* at 668).

¶ 12 Appellants initially assert that they cannot be liable in this action because there was no evidence that Dr. Smith's interpretation of the MRI/MRA films caused a delay in surgical intervention. In

this respect, Appellants focus on how Dr. Samhouri would have treated Ms. Monaghan and point to his testimony that even if the June 20, 2001 MRA/MRI would have been properly interpreted, he would not have operated on Ms. Monaghan until after June 23, 2001.

¶ 13 This argument is unrelated to the evidence regarding causation that was presented at trial. Appellees simply did not premise their causation on surgical treatment of the blockage in the arteries. When Ms. Monaghan was examined by Dr. Samhouri, she was asymptomatic, and would have been surgically treated in due time for the blockage. When Dr. Gauthier treated Ms. Monaghan at the hospital during the afternoon of June 23, 2001, however, she had become symptomatic. Appellees' evidence unequivocally established that a TIA, which Ms. Monaghan had experienced prior to presenting at the emergency room, indicates that person is displaying stroke-like symptoms. They also produced evidence that a symptomatic person with seventy percent stenosis of the carotid arteries should be immediately hospitalized and treated with drugs.

¶ 14 Dr. Michael J. Rosner, who was employed by Frankford Hospital, stated at trial that a patient with a TIA and with an MRA/MRI showing a critical degree of stenosis would have been immediately admitted to the hospital for appropriate drug therapy. See N.T. Trial (Jury) Vol. 2, 9/28/04, at 49–54. Appellees' expert witness on causation, neurologist George C. Newman, stated that Ms. Monaghan, given her symptoms and critical stenosis, should have been admitted and immediately treated with Heparin on her June 23rd visit to Frankford Hospital. He continued that if Ms. Monaghan had been administered appropriate drug therapy at Frankford Hospital after her TIA, there was at least a ninety-five percent chance that she would

not have suffered a massive stroke that night. N.T. Trial (Jury) Vol. 3, 9/29/04, at 85. Thus, the fact that Dr. Samhouri would not have operated on Ms. Monaghan until after June 23, 2001, is rendered irrelevant.

¶ 15 Appellants also maintain that there was no evidence that Dr. Gauthier relied upon Dr. Smith's incorrect interpretation of Ms. Monaghan's MRA/MRI study when he decided to discharge Ms. Monaghan at 8:00 p.m. on June 23, 2001. The medical records were devoid of any notation that Dr. Gauthier obtained the MRA/MRI report by Dr. Smith. Further, Dr. Gauthier indicated that he could not recall if he relied upon it during the course of his treatment of Ms. Monaghan.

¶ 16 While conceding the potential import of Dr. Gauthier's testimony that he could not recall reading the MRA/MRI report or remember whether he relied upon it, there was countervailing evidence at trial regarding these two critical facts. The record indicates both that Dr. Gauthier was aware that an MRA/MRI had been interpreted as revealing that Ms. Monaghan had non-critical stenosis, and that he discharged her because he believed that she had non-critical stenosis.

¶ 17 As noted, when reviewing whether a party is entitled to judgment n.o.v., we are required to view the evidence in the light most favorable to the verdict winner, Appellees herein, and they receive the benefit of every reasonable inference arising from that evidence. We also reject all testimony unfavorable to the verdict winners since that evidence was not credited by the jury.

¶ 18 Herein, the issue is whether there was evidence that Dr. Gauthier knew about and relied upon Dr. Smith's incorrect interpretation of the MRA/MRI when he decided to discharge rather than admit

Ms. Monaghan following her TIA. Appellees produced evidence to support the jury's findings as to these two facts. Ms. Whitaker testified clearly and unequivocally that she informed Dr. Gauthier about the results of the June 11, 2001 ultrasound **and** the results of the June 20, 2001 MRA/MRI. In addition, Dr. Gauthier indicated that he was aware of the findings reported by Dr. Rubin regarding the ultrasound and by Dr. Smith regarding the MRA/MRI. The fact that he may not have actually read Dr. Smith's report is not dispositive. Furthermore, Dr. Gauthier stated that he believed that Ms. Monaghan had non-critical stenosis and that he would not have discharged her if he knew she had critical stenosis.

¶ 19 The record is as follows. In his deposition, which was read to the jury, Dr. Gauthier stated that he was under the "impression that the MRI was better than the ultrasound and so [the stenosis] was **not** a high grade stenosis." N.T. Trial (Jury) Vol. 5, 10/5/04, at 7 (emphasis added). He confirmed that he was aware that the MRI report was "much better" than the ultrasound. *Id.* at 8. Thus, even though he may not have read the MRI, Dr. Gauthier's testimony itself establishes he knew about the results of the two tests and that Ms. Monaghan's MRI was interpreted as diagnosing her with non-critical stenosis. Dr. Gauthier's testimony was confirmed by the evidence produced by Ms. Whitaker.

¶ 20 Dr. Gauthier stated that he could not "remember" if he relied upon the MRI report, which is entirely neutral. That statement does not establish that he did or did not rely on the report; it indicates a lack of memory as to the issue. However, Dr. Gauthier also indicated absolutely that he would not have discharged Ms. Monaghan if he knew she had critical stenosis. Dr. Gauthier was asked, "[I]f you knew [Mrs. Monaghan] had a high-grade stenosis … would you have sent her home if you knew she had a high-grade stenosis, 70 plus critical?" *Id.* at 8. He responded, "I wouldn't, no." *Id.* Dr. Gauthier repeated, "I would have kept her if she had a high-grade stenosis." *Id.* at 9. Thus, at the time his deposition was taken, Dr. Gauthier was not able to remember if he relied upon the MRI. However, he stated unequivocally that he would not have discharged his patient had he known that she had critical stenosis. Appellees' evidence also established that he knew the MRI results.

¶ 21 Herein, the prevailing party presented evidence that Dr. Gauthier, by whatever means, knew about Dr. Smith's interpretation of the MRA/MRI test and that he based his decision to discharge Ms. Monaghan upon the fact that she had non-critical stenosis. The test that indicated that Ms. Monaghan had non-critical stenosis was the MRI. We are required under our standard of review to accept that evidence and to reject evidence to the contrary. We give the verdict winner the benefit of any inferences from the evidence.

¶ 22 Furthermore, Appellants are not entitled to judgment n.o.v. on the basis that there were conflicts in the evidence presented. *Burton–Lister v. Siegel, Sivitz and Lebed Associates,* 798 A.2d 231, 236 (Pa.Super.2002) ("JNOV must be denied where conflicting evidence has been presented to the jury."). Indeed, it is not within our power to reweigh conflicting testimony and to determine which is credible. "Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence." *Helpin v. Trustees of University of Pennsylvania,* 969 A.2d 601, 609 (Pa.Super.2009); *see also Stecher*

*v. Ford Motor Co.*, 779 A.2d 491 (Pa.Super.2001).

¶ 23 In actuality, Appellants are assailing the jury's conclusion that the inference created by the evidence was that Dr. Gauthier must have relied upon the MRA/MRI report, and Appellants are asking us to give weight to his testimony that he could not recall relying upon the report rather than the aforesaid inference. We are permitted to grant a new trial on weight-of-the-evidence grounds only "in truly extraordinary circumstances, *i.e.,* when the jury's verdict is 'so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.' " *Criswell v. King*, 575 Pa. 34, 834 A.2d 505, 512 (2003) (quoting *Armbruster v. Horowitz*, 572 Pa. 1, 813 A.2d 698, 703 (2002)). In light of Appellees' evidence that Frankford Hospital's protocol mandated immediate admission and treatment of symptomatic patients with critical stenosis, Dr. Gauthier's own statement that he would have admitted her if he knew she had critical stenosis, and Appellees' evidence that Dr. Gauthier was aware that the MRI indicated the stenosis was non-critical, we do not find it shocking that the jury found Dr. Gauthier must have relied on Dr. Smith's MRA/MRI interpretation when concluding that Ms. Monaghan did not need to be admitted to the hospital.

¶ 24 Appellants' next two issues relate to overlapping testimony from Appellees' two expert witnesses. Appellees presented the testimony of Robert G. Peyster, a neuroradiologist who is a specialist in the diagnosis and treatment of stroke and the conditions leading to stroke. Dr. Peyster established a breach of the applicable standard of care by Dr. Smith in misreading Ms. Monaghan's June 20, 2001 MRA/MRI. In his practice, Dr. Peyster interprets MRA/MRI studies for the early diagnosis of stroke and neurovascular disease that leads to stroke and has interpreted "in the high thousands" of such studies. N.T. Trial (Jury) Vol. 1, 9/27/04, at 15. Dr. Peyster offered a blistering criticism of Dr. Smith's interpretation of Ms. Monaghan's MRA/MRI, stating at one point that "no matter how you look at it. There's no way I could look at that [June 20, 2001 MRA/MRI] and think that there was a 50 percent stenosis." *Id.* at 68. He testified emphatically that the MRA/MRI demonstrated that Ms. Monaghan had ninety to ninety-nine percent blockage. Dr. Peyster's testimony also touched upon the fact that a patient experiencing a TIA with a high degree of stenosis would be admitted to the hospital and administered drug therapy. He concluded that had the proper protocol been followed with Ms. Monaghan, the massive stroke that she experienced later in the day on June 23, 2001, would have been avoided.

¶ 25 As to causation, as noted above, Appellees proffered neurologist George C. Newman as an expert witness. He discussed the fact that stenosis causes the blood flow to slow, leading to the formation of clots, which are also known as thromboses and which are the causative agents of strokes. He reviewed the medical records to discern what treatment Ms. Monaghan would have received if she had been admitted and what Dr. Gauthier said he would have done had he known about the critical stenosis revealed in the June 20, 2001 MRA/MRI. N.T. Trial (Jury) Vol. 3, 9/29/04, at 80. We set forth Dr. Newman's causation testimony:

Q. Did you see anything in the medical records to tell you what treatment Ms. Monaghan would have gotten had she been admitted as Dr. Rosner and Dr. Gauthier said they would have done if

they had known about the critical or high grade stenosis?

A. In the medical record or including depositions?

Q. Medical records, depositions, and also your background, training and experience. Please analyze that for the jury.

A. If—once Ms. Monaghan presented with her TIA, that is the first visit to the emergency room on June 23rd. And assuming that it was known that she had a critical carotid stenosis, and that the doctors who were taking care of her knew that she had a critical carotid stenosis. Then her management would have been, based on my experience and medical records and depositions, her management would have been first of all to admit her to the hospital. Secondly, to hydrate her. That is give her just fluids, salt water, that sort of thing. And then to put her on heparin, a major blood thinner, to prevent the clot from forming so that she wouldn't have a stroke.

Q. What is the efficacy, meaning the health given by the administration of heparin for Ms. Monaghan, had she been admitted on the afternoon of 6–23–01 as Dr. Gauthier and Dr. Rosner said would have occurred.

A. Right. Based on my own experience with somewhere between one and two hundred patients who have virtually the [identical] situation we're talking about with Ms. Monaghan, that is a critical carotid stenosis with flow restriction, followed by a TIA. I'm saying based on a hundred to two hundred cases which I personally have been involved, giving heparin in that setting is approximately **95 percent or higher effective in preventing a stroke.**

Q. Is heparin also called anticoagulation?

A. Yes. Heparin is a form of anticoagulation.

Q. Did you see anything in the deposition of Dr. Samhouri as to what he would have done had Ms. Monaghan become symptomatic, as she did this afternoon of June 23, 2001?

A. Absolutely. What I'm saying would have been the sequence is a standard approach to the management of a patient with critical carotid stenosis who is symptomatic with a TIA. The standard management, which is exactly what Dr. Samhouri says in his deposition, he says well if I knew she had a critical stenosis and she came in with a TIA, I would admit her and put her on heparin. It is the standard.

. . . .

Q. If Dr. Gauthier and Dr. Rosner admitted the patient and they got a vascular surgery consult and neurology consult, do you know, based on your review of this record, whether Ms. Monaghan would have received heparin?

A. Yes, we know that she would have received heparin.

*Id.* at 80–82 (emphasis added). Dr. Newman, during the course of his testimony, also criticized Dr. Smith's reading of the June 20, 2001 MRA/MRI, and also concluded that the diagnostic study revealed critical blockage in Ms. Monaghan's carotid arteries.

¶ 26 Thus, the testimony of these two expert witnesses was repetitive to the extent that the standard-of-care expert witness touched on the issue of causation, and the causation expert witness delved slightly into the deviation from the standard of care. However, we cannot agree that the trial court's decision to allow the testimony in question requires the grant of a new trial.

"Evidentiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law." *Takes v. Metropolitan Edison Co.,* 440 Pa.Super. 101, 655 A.2d 138, 145 (1995) *(en banc), reversed in part on other grounds,* 548 Pa. 92, 695 A.2d 397 (1997). "In order to find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party." *Collins* [*v. Cooper*], 746 A.2d [615,] 619 [ (Pa.Super.2000) ] citing *Romeo v. Manuel,* 703 A.2d 530, 532 (Pa.Super.1997). " 'Appellant must therefore show error in the evidentiary ruling and resulting prejudice, thus constituting an abuse of discretion by the lower court.' " *Id.* at 620[.]

*Oxford Presbyterian Church v. Weil–McLain Co., Inc.,* 815 A.2d 1094, 1099–1100 (Pa.Super.2003).

¶ 27 Appellants argue that the evidence was improperly admitted because it went beyond the fair scope of the reports issued by these expert witnesses.

The admission of expert testimony is within the trial court's sound discretion and we will not disturb that decision without a showing of manifest abuse of discretion. An expert's testimony on direct examination is to be limited to the fair scope of the expert's pre-trial report. In applying the fair scope rule, we focus on the word "fair." Departure from the expert's report becomes a concern if the trial testimony "would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response." Therefore, the opposing party must be prejudiced as a result of the testimony going beyond the fair scope of the expert's report before admission of the testimony is considered reversible error. We will not find error in the admission of testimony that the opposing party had notice of or was not prejudiced by.

*Coffey v. Minwax Company, Inc.,* 764 A.2d 616, 620–621 (Pa.Super.2000) (citing *Petrasovits v. Kleiner,* 719 A.2d 799, 804 (Pa.Super.1998)).... "The purpose of requiring a party to disclose, at his adversary's request, 'the substance of the facts and opinions to which the expert is expected to testify' is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony." *Corrado v. Thomas Jefferson University Hospital,* 790 A.2d 1022, 1029 (Pa.Super.2001) (citing *Walsh v. Kubiak,* 443 Pa.Super. 284, 661 A.2d 416 (1995)).

*Stalsitz v. Allentown Hospital,* 814 A.2d 766, 779–780 (Pa.Super.2002).

¶ 28 In this case, Appellants were fully apprised of the nature of the purported deviation from the standard of care as well as the factual premise for causation. They were prepared to defend against the testimony that went beyond each expert witness's report because the testimony in each instance was identical. As Appellants had a response prepared and were able to defend against all the opinions offered by the two expert witnesses, a new trial is not required.

¶ 29 Appellants also complain about the cumulative nature of the evidence. Each expert witness largely confined his testimony to the segment upon which he was to opine. Each expert witness clearly and unequivocally established the necessary component of liability in his area of expertise. We cannot conclude that a new trial is warranted merely because each expert witness touched briefly upon the subject matter that was thoroughly covered by the

other expert witness. The slightly cumulative nature of the intersecting testimony was not so harmful that the result at trial would have been different had the testimony been restricted, and a new trial is not required. *See Oxford Presbyterian Church, supra.*

¶ 30 Appellants next contend that Dr. Peyster testified beyond his area of expertise when he stated that Dr. Smith's misreading of the MRA/MRI increased the risk of harm to Ms. Monaghan. We cannot agree. Dr. Peyster is a specialist with substantial credentials in the diagnosis and treatment of stroke and the conditions leading to stroke. N.T. Trial (Jury) Vol. 1, 9/27/04, at 11–24. He was unquestionably qualified to testify about the proper treatment of a patient presenting with critical stenosis and symptoms of stroke and whether the misinterpretation of the MRA/MRI affected Ms. Monaghan's treatment on the afternoon of June 23, 2001.

¶ 31 Appellants also assail the trial court's decision to restrict the testimony of vascular surgeon Matthew Dougherty, their expert witness, as to whether Frankford Hospital properly treated Ms. Monaghan once she presented to the emergency room on the afternoon of June 23, 2001. Dr. Dougherty's report solely examined the care provided by vascular surgeon Dr. Samhouri. It detailed how the ultrasound conflicted with the MRA/MRI and whether Dr. Samhouri should have operated on Ms. Monaghan before she suffered her stroke. Significantly, Dr. Dougherty's report did not to any extent criticize the care delivered to Ms. Monaghan during her first visit to Frankford Hospital. The report did not discuss whether her treatment at that hospital fell below the applicable standard of care. Thus, when Dr. Dougherty started to address whether Dr. Gauthier properly treated Ms. Monaghan when she first presented at the emergency room, he clearly was testifying beyond the fair scope of his report. The trial court did not abuse its discretion in sustaining Frankford Hospital's objection to that testimony as the hospital was unfairly surprised by this attack from the expert witness of its co-defendant.

¶ 32 Finally, Appellants suggest that the damages awarded in this case were excessive.

Our standard of review in reversing an order denying a remittitur by a trial court is confined to determining whether there was an abuse of discretion or an error of law committed in such denial. *Smalls v. Pittsburgh–Corning Corp.,* 843 A.2d 410, 414 (Pa.Super.2004).

The grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court. *Hall v. George,* 403 Pa. 563 170 A.2d 367 (1961). This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. *Kravinsky v. Glover,* 263 Pa. Superior Ct. 8, 396 A.2d 1349 (1979). We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive. *Mineo v. Tancini,* 349 Pa. Superior Ct. 115, 502 A.2d 1300 (1986).

*Tindall v. Friedman,* 970 A.2d 1159, 1176–1177 (Pa.Super.2009) (quoting *Gbur, supra* at 212). In this case, Ms. Monaghan suffered a debilitating stroke resulting in devastating injuries and the special damages amounted to approximately $1,250,000. Prior to June 23, 2001, at age seventy-three, she was an independent woman who enjoyed shopping, games, and dances. After the stroke, she became unable to per-

form any activity of daily living without assistance. Even though alert and aware, Ms. Monaghan has enormous difficulty expressing herself and moving and is nightmarishly trapped in her own body. Under the circumstances, we cannot conclude that the trial court abused its discretion in not awarding remittitur of this $5,200,000 verdict.

¶ 33 Judgment affirmed.

¶ 34 Judge ORIE MELVIN Concurs in the Result.