J-A08032-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ANN SMITH, AS EXECUTRIX OF THE ESTATE OF DALE SMITH, DECEASED, ON BEHALF OF HERSELF INDIVIDUALLY, SURVIVING SPOUSE OF THE DECEDENT, AND THE NEXT OF KIN OF DALE SMITH, AND ON BEHALF OF THE ESTATE OF DALE SMITH, DECEASED | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : | No. 1166 WDA 2018 |
| v. | : : : : | |
| MARC CORDERO, M.D. AND UPMC MCKEESPORT, A DIVISION AND HOSPITAL OF THE UNIVERSITY OF PITTSBURGH MEDICAL CENTER AND UPMC WOUND HEALING SERVICES AT UPMC MCKEESPORT, A DIVISION OF UPMC MCKEESPORT AND THE UNIVERSITY OF PITTSBURGH MEDICAL CENTER | : : : : : : : : : : : | |

Appeal from the Order Entered August 7, 2018
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-14-014061

BEFORE: PANELLA, P.J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: APRIL 8, 2021**

This case has returned to us on remand from the Pennsylvania Supreme Court. We conclude Smith waived her challenge to the jury selection process and the court did not abuse its discretion in permitting UPMC's expert to testify. We therefore affirm.

This is a medical malpractice case brought by Ann Smith, as Executrix of the Estate of Dale Smith, deceased, on behalf of herself individually, the next-of-kin of Dale Smith, and on behalf of the Estate ("Smith"). Dale Smith ("Decedent"), who suffered from diabetes, kidney disease, and other ailments, sought treatment from Marc Cordero, M.D., for leg wounds/ulcers. Dr. Cordero allegedly misdiagnosed the leg wounds as venous, not arterial, and this misdiagnosis allegedly caused Decedent to have his leg amputated. The amputation in turn allegedly caused a series of events that ultimately resulted in Decedent's death. Smith then instituted this suit against Dr. Cordero, UPMC McKeesport, a division of the University of Pittsburgh Medical Center, and UPMC Wound Healing Services at UPMC McKeesport, a division of UPMC McKeesport and the University of Pittsburgh Medical Center (collectively "UPMC").

Jury selection commenced in March 2018. A court clerk, not the trial judge, conducted the *voir dire*. The *voir dire* proceeding before the court clerk was not transcribed. Smith made motions to challenge for cause Jurors No. 25, 37, and 45. The parties appeared before the trial judge for a hearing on the motions. The hearing before the trial judge as to the challenges was transcribed.

The motions to challenge for cause related to the jurors' affirmative answers to two questions:

> [1.] Do you have any feelings or opinions about whether medical malpractice lawsuits affect the cost, availability and other medical services[?]

. . .

[2.] Do you have any feelings or opinions as to whether there should be a minimum or maximum amount of money that can be awarded to an injured party?

N.T., 3/26/18-4/3/18, at 4-5. Counsel explained to the court the responses and reaction of the jurors.

The trial judge noted his options, which included conducting a *voir dire* of the jurors:

THE COURT: So I got a couple choices. I could deny all the motion[s]. You want them all stricken for cause. I could grant them all or if I think that it's somewhere in the middle, I could actually *voir dire* them myself and with you guys there and then make a decision. I'm basically going to ask the same questions . . . , except it's the Judge come down to my office and I'm not have my robe on and I will be asking them these questions.

*Id.* at 12. The trial judge did not conduct a *voir dire*, and neither party requested that he do so.

The trial court granted the motion as to Juror No. 37, but denied it as to Jurors No. 25 and 45:

If I heard you guys correctly, for me I don't seem to have a problem with denying -- and again, this is the story that you guys told me -- your motion Counsel, for number 25 and 45, I will deny those.

I have more of a problem with 37 so I'm inclined to strike that. So I will allow the other two and sounds like I've heard enough of number 37, so I would strike her. Grant your motion on 37 and I will deny your motions on 25 and 45.

*Id.* at 13. Smith used a peremptory strike for one of the jurors and the other juror was an alternate. Smith used all peremptory strikes.

Smith filed a motion *in limine* to preclude the expert testimony of Harold Brem, M.D., claiming, among other things, that Dr. Brem failed to set forth any factual basis or a summary of the grounds for multiple opinions on the issues of standard of care and causation.

Dr. Brem's report included the following opinions:

1. Dr. Cordero provided excellent care. He properly diagnosed Mr. Smith and treated his leg ulcer at or above the standard of care. Seeing patients with leg ulcers and diabetes every two weeks is a common and acceptable practice.

2. Mr. Smith's leg ulcers were by all criteria to be considered venous ulcers. There is no suggestion that they are arterial.

3. The use of Medihoney gel, has excellent data and is a commonly used topical for patients with diabetes and non-healing wounds. There is no data or rational to think Santyl would be more helpful. The use of the compression device (Tubigrip) was a reasonable and prudent measure for the care and treatment of venous ulcers.

4. No event could have prevented Mr. Smith's amputations. It is a direct consequence of the combination of age, uncontrolled diabetes, End-Stage Renal Disease, and Peripheral Vascular Disease. My opinion is heavily supported by the literature and the multiple mechanisms for impaired healing. In Mr. Smith's particular case, his high risk for infection was diagnosed and he was successfully treated. He lost his right limb because of an exceptionally rare organism termed Group A Streptococcus. It occurred because of Mr. Smith's diabetes that made him prone to this organism. This bacteria or organism is known to cause necrotizing infections like Mr. Smith had.

5. There is no evidence that Mr. Smith had arterial disease that could have been corrected and his limb preserved.

6. Dr. Dreyfuss' report that these were arterial ulcers is not predicated in medical fact. The accusations that this ulcer was arterial based in part on the photographs as well that

the right leg limb loss was preventable are inaccurate and frivolous. Mr. Smith had a very natural outcome from type 2 diabetes. He lost his left limb unfortunately. Clearly his body suffered multiple organ problems from a consequence of his multiple co-morbidities. Dr. Dreyfuss' assertions are scientifically unfounded and not substantiated by the literature.

7. The reason the four wounds became one is the natural sequence of the underlying pathology. Simply stated, the wounds were treated correctly and not just skin deep.

8. Dr. Diamond, Mr. Smith's primary MD was involved. He was made aware of the results of the wound culture on December 23, 2013, and prescribed oral Vancomycin at that time. Dr. Cordero appropriately requested that Dr. Diamond manage Mr. Smith's antibiotics due to his End-Stage Renal Disease, chronic Cirrhosis, and prior reaction to a prescribed antibiotic. This was highly prudent and demonstrates another example of excellent comprehensive care and expertise by Dr. Cordero and his wound center team.

9. Dr. Cordero and his team were clearly well trained, as manifested by the knowledge shown in their notes and attention to detail. Their care was well within the standard of care.

10. Mr. Smith met or exceeded his life expectancy. His loss of both limbs was a tragic and unfortunate consequence of type 2 diabetes. For not the extraordinary care of his wife and the exceptional care of his clinicians, his natural course of living would not have been this long. Simply stated, he lived a full life expectancy with quality until his last year in life. His demise was a consequence of type 2 diabetes coupled with multiple other morbidities (i.e., hypertension, renal disease and heart disease).

11. There is no correlation between Mr. Smith's amputations and the care provided by Dr. Cordero and the UPMC McKeesport Wound Center.

12. My opinions in this report have been done so with a reasonable degree of medical certainty.

Letter from Harold Brem to UPMC's Counsel dated February 19, 2018. The court denied the motion *in limine*.

During Dr. Brem's testimony, Smith objected, arguing the court should preclude the opinion that the wounds were not misdiagnosed because the report did not provide a basis:

> [Smith's Counsel]: Well, he can't come in here and [say] it's venous with nothing more. He did not give a basis. He can't come in and testify that it's venous versus arterial. There is no bases in his reports and just testify on the stand that it's just his evaluation. He does go onto say that it's based on many, many factors to justify venous versus arterial. Nowhere whatsoever does he give a basis for venous versus arterial.

N.T., 3/26/18-4/3/18, at 668, 678. The court overruled the objection.

Dr. Brem testified about his opinions, and the basis for them, including the factors for determining whether a wound is venous or arterial. On cross-examination, Smith's counsel questioned him about the application of those factors. Dr. Brem further testified as to the reasons to perform a debridement and that the procedure in this case was within the standard of care. *Id.* at 686-88. This testimony contradicted Smith's expert, who had testified that debridement was not proper here. *Id.* at 427.

Further, during Dr. Brem's testimony, he made an unspecific reference to "literature," at which point Smith objected. The trial court overruled the objection:

> [Dr. Brem:] He developed what they call necrotizing fasciitis or otherwise known as a man-eating flesh. It's when you have a rapid progressing infection classically. And someone of his age with diabetes -- it could happen to anybody – it's

happened to children; but it's very classical in diabetes. The literature shows that --

[Smith's counsel]: Objection.

THE COURT: We can do it in one word and if not, let's go up there.

[Smith's counsel]: The reference is to the literature.

THE COURT: Overruled.

*Id.* at 705.

The jury found in favor of UPMC. Smith filed post-trial motions, which were denied, and Smith timely appealed. She raises the following issues:

> 1. Whether the trial court erred in violation of ***Shinal v. Toms***, 162 A.3d 429 (Pa. 2017) by denying two of Appellant's jury challenges for cause without personally witnessing the *voir dire* process and failing to evaluate the demeanor of the challenged jurors?
>
> 2. Whether the trial court erred in permitting testimony from Appellee's expert, Dr. Harold Brem, where Dr. Brem's expert report failed to set forth the grounds upon which his opinions were based in direct violation of Pa.R.C.P. 4003.5, and where his testimony went well beyond the four corners of the report?

Smith's Br. at 5.

Smith maintains the trial judge erred in denying the motions to strike the potential jurors, noting the judge did not witness *voir dire* and therefore did not see the jurors' conduct and demeanor. We previously issued an opinion vacating the judgment in reliance on our decision in ***Trigg v. Children's Hospital of Pittsburgh of UPMC***, 187 A.3d 1013 (Pa.Super. 2018), *vacated*, 229 A.3d 260 (Pa. 2020). UPMC sought further review, and the Pennsylvania Supreme remanded this case for further proceedings consistent with its

decision in **Trigg**. **See Smith v. Cordero**, 223 A.3d 268 (Pa.Super. 2019), *vacated*, No. 262 WAL 2019, 2020 WL 2537060 (Pa. May 19, 2020).

In **Trigg**, the plaintiffs alleged that the "Allegheny County Civil Division's jury selection process deprived them of their right to a fair trial." 187 A.3d at 1015. They alleged the failure to strike three prospective jurors for cause was error and that the error was prejudicial. **Id.** at 1016. This Court described the *voir dire* practice for civil cases in Allegheny County, as used in that case. According to the **Trigg** court, the court clerk and parties' attorneys met with the potential jurors. **Id.** If an attorney sought to challenge a potential juror for cause, the clerk noted the challenge and, after interviewing all jurors, the clerk and attorney returned to the courtroom of the calendar judge. **Id.** The judge would then read the transcript and rule on the challenges for cause. **Id.** In **Trigg**, after the above process, the trial judge denied a motion to strike three jurors for cause. **Id.** The plaintiffs then used three of their four peremptory strikes to remove the jurors. **Id.**

This Court in **Trigg** first addressed the deference we owe to the trial court where the trial judge was not present for the juror questioning during *voir dire*. Stating that the trial judge "possess[ed] no greater skill at interpreting a transcript than an appellate court," the Court applied a *de novo* standard of review to rulings on motions to strike jurors for cause where the trial judge was not present during juror questioning. **Id.** at 1018. The Court then concluded that failing to strike one juror due to her predisposition was

- 8 -

error and that the error was not harmless, as the plaintiffs were forced to use their peremptory challenges. *Id.* at 1019.

The Pennsylvania Supreme Court granted review in *Trigg*, and, in April 2020, it vacated the judgment of this Court and remanded for further proceedings. The Court concluded the plaintiffs had waived the argument that the trial court erred by not observing the demeanor and tenor of the prospective juror. *Trigg v. Children's Hosp. of Pittsburgh of UPMC*, 229 A.3d 260, 269 (Pa. 2020). The court noted that the plaintiffs had not made any "objection in pretrial motions to the trial judge's absence from the Jury Assignment Room during *voir dire*." *Id.* Further, "when [the plaintiffs] made their challenge for-cause to the seating of prospective juror 29, they did not contemporaneously object to the trial judge's absence from the room during *voir dire*." *Id.* Also, the plaintiffs' challenge during *voir dire* "was predicated on the substance of the answers which [the juror] gave." *Id.* The Court concluded that the "record [did] not support [the plaintiffs'] claim that, as part of their challenge for-cause, they implicitly raised issues concerning the inability of the trial judge to assess the demeanor of prospective juror 29 as she gave her answers." *Id.* at 270. The Court further concluded that arguing in post-trial motions that the judge erred in failing to strike the juror because the judge did not have an opportunity to observe the juror did not preserve the issue. *Id.* Rather, in the Court's view, the failure "to raise with the trial judge any issue relating to his lack of observation of this juror's demeanor in answering *voir dire* questions," and to "request that he personally interview

the juror," "the trial judge was deprived of any opportunity to address and resolve the issue before the jury was finally empaneled." ***Id.***

Here, as in ***Trigg***, Smith failed to raise in any pre-trial motions, or in her for-cause challenges during *voir dire* proceedings, any claim that error occurred because the trial judge did not observe the questioning of the jurors or their demeanor. The first time she made such a challenge was in post-trial motions. Further, although the trial judge noted that he could conduct a *voir dire* of the jurors, Smith did not ask him to do so. Accordingly, in accordance with the Pennsylvania Supreme Court's decision in ***Trigg***, we conclude that Smith waived her challenge to the *voir dire* process.

Smith next claims the trial court erred by denying her motion *in limine* to preclude the expert report of Harold Brem, M.D., and by permitting Dr. Brem to testify to unsupported and conclusory expert opinions that were outside the scope of his report. She claims that whether the wounds were venous or arterial required a multi-factorial analysis, but Dr. Brem's report failed to support his conclusion that the wounds were venous with any discussion of the factors. The court then permitted him to testify extensively about it. Smith also stated that Dr. Brem testified as to why debridement was an appropriate treatment, even though his report did not mention this. Smith claims that "[c]ontrasting Dr. Brem's bare bones expert report with his lengthy and detailed trial testimony . . . , [Smith] was ambushed at trial and could not possibly prepare an informed line of questioning to cross-examine the witness." Smith's Br. at 51. Smith further argued that Dr. Brem should not

have been allowed to testify that his opinions were supported by "the literature." *Id.* at 52 (citing ***Aldridge v. Edmunds***, 750 A.2d 292 (Pa. 2000)).

UPMC counters that Dr. Brem's expert report provided adequate notice of his expert opinions, and his trial testimony was within the fair scope of the report. UPMC asserts that his report discussed multiple factors for determining whether a wound is venous or arterial. According to UPMC, he "analyze[d] the impact of decedent's age, uncontrolled diabetes, end-stage renal disease and peripheral vascular disease on decedent's leg amputations and ultimate death by explaining how the consequences of these conditions bear on circulation, temperature, granulation, drainage and pressure of blood leakage." UPMC's Br. at 32-33. UPMC claims Dr. Brem discussed the location of the wounds and some appropriate measures to treat the wounds, and that he "opined that decedent's comorbidities caused multiple organ problems and prevented the healing of his wounds or preservation of his legs." *Id.* at 33.

UPMC argues that Dr. Brem's trial testimony was within the "fair scope" of his report because in his testimony, he discussed and explained the same factors. *Id.* It further argues that the testimony did not surprise Smith, and "at most, expanded upon his expert report and thus did not hinder [Smith's] counsel from being able to prepare a meaningful response." *Id.* at 34. UPMC points out that Smith "extensively cross-examined Dr. Brem . . . regarding the diagnosis of wounds as venous versus arterial." *Id.* It also contends the trial testimony was "appropriate . . . to rebut the expert testimony put forth by [Smith] at trial." *Id.* at 35.

The "admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." **Woodard v. Chatterjee**, 827 A.2d 433, 440 (Pa.Super. 2003) (quoting **Walsh v. Kubiak**, 661 A.2d 416, 419 (Pa.Super. 1995) (*en banc*)).

"[E]xpert[] testimony on direct examination is to be limited to the fair scope of the expert's pre-trial report." **Whitaker v. Frankford Hosp. of City of Phila.**, 984 A.2d 512, 522 (Pa.Super. 2009) (quoting **Coffey v. Minwax Co., Inc.**, 764 A.2d 616, 620 (Pa.Super. 2000)). **See also** Pa.R.C.P. 4003.5(c) (providing "[t]o the extent that the facts known or opinions held by an expert have been developed in discovery proceedings . . . , the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings . . .").

"In applying the fair scope rule, we focus on the word 'fair.'" **Whitaker**, 984 A.2d at 522 (quoting **Coffey**, 764 A.2d at 620-21). "Departure from the expert's report becomes a concern if the trial testimony 'would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response.'" **Id.** (quoting **Coffey**, 764 A.2d at 621). We will find reversible error only if the opposing party is prejudiced as a result of the testimony going beyond the fair scope of the expert's report. **Id.**

The trial court found the admission of the testimony proper, reasoning that the report contained a sufficient summary of the grounds for his opinion and the testimony was not an unfair surprise:

> Dr. Brem's report satisfied Pa.R.C.P. 4003.5 in that the report sufficiently stated the facts and opinions on which Brem eventually testified and likewise contained a sufficient summary of the grounds for his opinions. Additionally, Brem's testimony was consistent with, and was within the fair scope of, his report. **Daddona v. Thind**, 891 A.2d 786, 805 (Pa.Cmwlth. 2006); Pa.R.C.P. 4003.5. Nothing about Dr. Brem's testimony constituted unfair surprise or other error. **See Daddona**, 891 A.2d at 805 (indicating purpose of Pa.R.C.P. 4003.5 is to avoid unfair surprise). Admission of his testimony was proper.

Trial Court Opinion, filed Aug. 9, 2018, at 2.

The trial court did not abuse its discretion in admitting Dr. Brem's testimony. Although Dr. Brem's expert report did not detail all the factors considered to determine that the wound was venous, he noted that it was a multi-factorial test. Indeed, he explicitly said that the ulcers were by "all criteria" – *i.e.*, more than one criterion – venous ulcers. The report further discusses, among other things, the location of the wound, and Smith's various illnesses, including diabetes and kidney disease, which he noted contributed to the healing issues and infections. At trial, Dr. Brem provided more discussion and explanation of the factors for determining whether wounds are venous or arterial. Smith was readily able to cross-examine Dr. Brem about those factors. She was not surprised by or unprepared to respond to the testimony.

In her brief, Smith also challenges Dr. Brem's discussion of debridement. Smith did not object to that testimony at the trial, and therefore waived the claim. Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Moreover, even if she had not waived it, we would find no error. Dr. Brem's discussion of debridement followed the testimony of Smith's expert, as well as that of Dr. Cordero, regarding debridement, and the discussion caused no surprise to Smith.

Smith also challenges Dr. Brem's reference to "literature." Although, Dr. Brem referenced "literature" during his testimony, no textbooks or other materials were admitted into evidence. Further, the single, vague reference to "literature" in the abstract, in the context of the extensive expert testimony in this case, did not prejudice Smith. **See Aldridge v. Edmunds**, 750 A.2d 292, 297-98 (Pa. 2000) (concluding that "judicious use of learned treatises may be made on direct examination of an expert witness in appropriate circumstances for the limited purpose of explaining the basis for the opinion," but finding error where excerpts were enlarged on poster board and the expert was guided through a series of leading questions regarding the texts).

Judgment affirmed.

President Judge Panella joins the memorandum.

Judge Stabile concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/8/2021