J-S49031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: S.O. | IN THE SUPERIOR COURT OF
PENNSYLVANIA

APPEAL OF: E.C.B. | No. 586 MDA 2015

Appeal from the Order entered March 6, 2015,
in the Court of Common Pleas of Cumberland County, Orphans'
Court, at No(s): 3 Adoptions 2015

IN RE: ADOPTION OF: T.A., A MINOR | IN THE SUPERIOR COURT OF
PENNSYLVANIA

APPEAL OF: E.C.B. | No. 587 MDA 2015

Appeal from the Order entered March 6, 2015,
in the Court of Common Pleas of Cumberland County, Orphans'
Court, at No(s): 4 Adoptions 2015

BEFORE:  BENDER, P.J.E., ALLEN, and OLSON, JJ.

MEMORANDUM BY OLSON, J.:                 **FILED AUGUST 28, 2015**

E.C.B. ("Mother") appeals from the decrees and orders dated March 3, 2015, and entered on March 6, 2015, in the Court of Common Pleas of Cumberland County, which granted the petition filed by the Cumberland County Children and Youth Services ("CYS" or "Agency") seeking to involuntarily terminate her parental rights to her minor children, S.O., a female born in January of 2011, and T.A., a male born in April of 2013, (collectively, the "Children"), pursuant to section 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b), and

directed CYS not to provide Mother any further visitation with the Children.

We affirm.[1]

The trial court set forth the factual background and procedural history

of this appeal as follows.

On the evening of September 30, 2013, Mother and T.A's [f]ather were involved in a domestic dispute. As [M]other was leaving in her S.U.V. [(sports utility vehicle),] she struck and killed T.A.'s [f]ather. Rather than stay at the scene, Mother drove to a bar about an hour away. The police located her at the bar several hours later. She appeared to be intoxicated. A subsequent blood test showed that she had consumed a combination of drugs and alcohol. She was taken into custody and has remained incarcerated ever since.

At the request of the Agency[,] the [C]hildren were placed on an emergency basis with Mother's sister[,] R.F.[,] and her husband[,] S.F. S.O. had spent a significant amount of time with the "F" family before the birth of her brother[,] T.A., including several months she had been removed from the home by the Agency in 2012. The [C]hildren were found to be dependent on October 3, 2013. They have been with the "F" family throughout their entire time in placement.

On September 2, 2014, Mother pled guilty to involuntary manslaughter in connection with the death of T.A.'s father. She was sentenced to [two and a half] to [five] years in a state correctional institution, with credit from October 1, 2013. She

---

[1] S.O.'s father, J.W., voluntarily relinquished his parental rights. T.A.'s father, J.A., is deceased. *See* Trial Court Opinion, 5/7/15, at 1 n.1. The trial court also entered orders on March 10, 2015, that changed the permanency goal for the Children to adoption pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and on March 25, 2015, that denied Mother's request for continuation of visitation pending appeal. Mother separately appealed those orders at docket number 601 MDA 2015. Judge Edward E. Guido presided over the proceedings in both the termination/visitation matters in the Orphans' Court Division, and the goal change/visitation orders in the Juvenile Division of the trial court. We will address Mother's appeals from the goal change/visitation orders in a separate Memorandum.

will not be eligible for parole until April 1, 2016. As part of her sentence[,] Mother was ordered to obtain a drug and alcohol evaluation and comply with the treatment recommendations[,] as well as to complete an anger management program.

Trial Court Opinion, 5/7/15, at 1-3 (internal footnotes omitted).

On January 23, 2015, CYS filed petitions seeking to involuntarily terminate Mother's parental rights to the Children. On January 27, 2015, the trial court appointed Attorney Cindy Villanella to serve as the Guardian *ad Litem* ("GAL") for the Children.

On February 4, 2015, the trial court held an evidentiary hearing on the issues of termination and goal change.[2] At the hearings, CYS presented the testimony of S.O.'s counselor and "play therapist," Glenford Kauffmann, via telephone, as an expert in therapy for children. N.T., 2/4/15 and 5/3/15, at 9-10, 16. Mr. Kauffman works for Family Resource and Counseling Centers in Gap and Lancaster, Pennsylvania. *Id.* at 10. Mr. Kauffman used sand in a sandbox for the play therapy with S.O. *Id.* at 14. CYS then presented the testimony of Amanda Sigrist, who previously was the CYS caseworker assigned to the Children. *Id.* at 35-36. Next, CYS presented the testimony of Virginia Koser, who became the CYS caseworker assigned to the Children on October 29, 2014. *Id.* at 48. CYS then presented the testimony of Kathleen Kelly, the Court-Appointed Special Advocate volunteer for the Children ("CASA"). *Id.* at 62-64. Finally, CYS presented the testimony of

---

[2] At that time, the permanency goal for the Children was return to parent with a concurrent goal of adoption.

- 3 -

Mother's brother-in-law, S.F., who is the Children's foster father, ("Foster Father").[3]  *Id.* at 53, 68, 97-98.  S.F. testified that he and his wife are willing to adopt the Children.  *Id.* at 72.

Mother presented the testimony of her former husband, E.G.B.  *Id.* at 73-74.  Mother then presented the testimony of her former male roommate, H.B.  *Id.* at 82.  Mother also testified on her own behalf.  The GAL presented the testimony of Foster Father.  *Id.* at 137.  The GAL then presented the testimony of C.A., the stepmother of T.A.'s father, J.A.  *Id.* at 137.  Finally, CYS presented, via telephone, the testimony of Officer Cory Keen, a police officer for Silver Spring Township, who responded to the call regarding J.A.'s death, and located Mother in the bar in Annville, Pennsylvania.  *Id.* at 142.

In the Orphans' Court Division, on March 6, 2015, the trial court entered two separate decrees dated March 3, 2015, involuntarily terminating the parental rights of Mother to the Children, without specifying the subsections of section 2511 under which it was terminating Mother's parental rights.[4]  In another order dated March 3, 2015, and entered in each child's case on March 6, 2015, the trial court directed that CYS have no further visitation between Mother and the Children.

_____

[3] S.F.'s wife, R.F., is Mother's adoptive sister.  *Id.* at 53, 70, 97-98.

[4]  In another order dated March 3, 2015, and entered on March 6, 2015, the trial court provided that it was terminating Mother's parental rights pursuant to section 2511(a)(5), (8), and (b).  In its opinion, the trial court stated that it terminated Mother's parental rights on the basis of section 2511(a)(2), (5), (8), and (b).  Trial Court Opinion, 5/7/15, at 7 and n.36.

- 4 -

In the Juvenile Court Division, in orders dated March 3, 2015, and entered on March 10, 2015, the trial court changed the permanency goal for the Children to adoption pursuant to section 6351 of the Juvenile Act. In orders dated March 3, 2015, and entered on March 5, 2015, the trial court directed CYS not to have any further visitation between Mother and the Children. On March 16, 2015, Mother filed a motion to direct CYS to continue visits between her and the Children pending appeal. The trial court denied the motion on March 25, 2015.

On April 2, 2015, Mother filed in the Orphans' Court Division notices of appeal from the termination decrees and orders, and the visitation orders entered on March 6, 2015, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On April 2, 2015, Mother filed in the Juvenile Court Division notices of appeal, along with concise statements of errors complained of on appeal, from the orders denying the goal change and visitation, including the March 10 and March 25, 2015 orders. She requested the consolidation of her appeals from the termination decrees and orders entered March 6, 2015, and stated that the matters in the Juvenile Court Division were also directly related and should be consolidated therewith. On April 16, 2015, this Court consolidated the appeals from the Orphans' Court Division's decrees and orders, which are assigned docket numbers 586 MDA 2015 and 587 MDA 2015. We listed an appeal from the Juvenile Court Division's orders at

docket number 601 MDA 2015, to be decided consecutively to the termination appeals.

Herein, we focus on the appeals from the termination decrees and orders, and the visitation orders. Mother raises the following issues.

1. Was the [t]rial [c]ourt's decision to terminate the parental rights of [] Mother to her one and four year old children supported by competent evidence where [] Mother's minimum incarceration term is up on April 1, 2016[,] and where [] Mother has cooperated in every way with [CYS], has forwarded significant monthly child support payments to the foster parents and has the financial means to continue doing so until her release, has routinely mailed letters and pictures and gifts to the [C]hildren, has shown a willingness to participate in every prison program available to improve herself, has the ability to communicate with the [C]hildren via virtual visitation and by telephone while in prison, has continued to maintain an ideal home for her children to move into immediately upon her release from prison, and[,] where the foster parents who are her sister and brother-in-law[,] are willing to care for the [C]hildren until her release[,] whether or not her parental rights are terminated, and where there was no clear and convincing evidence presented that [] Mother cannot successfully resume parenting the [C]hildren immediately upon her release[?]

2. Was the [t]rial [c]ourt's decision that the termination of [] Mother's parental rights best serves the needs of the [C]hildren at issue supported by competent evidence based upon the above facts among others established on the record?

3. Did the [t]rial [c]ourt abuse its discretion and err as a matter of law in terminating the parental rights of [] Mother where [CYS] failed to provide her with reasonable efforts to promote reunification between her and her daughter[,] S.O.[,] prior to filing its termination petition?

[4.] Did the [t]rial [c]ourt abuse its discretion and err as a matter of law in admitting and considering as part of its decision to terminate the parental rights of [] Mother, over objection set forth in the record, Glenford Kaufman's opinion testimony[?]

[5]. Did the [t]rial [c]ourt abuse its discretion and err as a matter of law in admitting and considering as part of its decision to terminate the parental rights of [] Mother, over objection set forth in the record, reports prepared by the Court Appointed Special Advocate Kathleen Kelly[?]

[6.] Did the [t]rial [c]ourt abuse its discretion and err as a matter of law in admitting and considering as part of its decision to terminate the parental rights of [] Mother, over objection set forth in the record, the opinion of Kathleen Kelly on the question of whether or not [] Mother's parental rights should have been terminated in favor or adoption?

[7.] Did the [t]rial [c]ourt abuse its discretion and err as a matter of law in denying further visits between [] Mother and her children pending appellate review of the [t]rial [c]ourt's orders terminating [] Mother's parental rights?

Mother's Brief at 10-11.

First, we will address Mother's issues 1 and 2, which Mother discusses together in her brief. *See* Mother's Brief at 31-36. Mother argues that there was insufficient evidence to support the termination of her parental rights because she was making efforts to utilize the resources available to her in prison to maintain contact with the Children. Mother contends that the trial court's decision to terminate her parental rights was premature, and that the trial court lacked relevant expert testimony regarding any ill effects that the Children would suffer if reunified with her. Mother claims that she has been demonstrating significant efforts to correct her parenting mistakes. Mother suggests that, when she is eligible for release on parole in April of 2016, S.O. will be five years old, and T.A. will be three years old. She states that

the F.'s have agreed to support Mother if she maintains her parental rights.

*See* Mother's Brief at 35-36.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

- 8 -

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.*, *quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court terminated Mother's parental rights under section 2511(a)(2), (5), (8), and (b). *See* Trial Court Opinion, at 5/7/15, at 7 and n.36. Section 2511(a)(2), (5), (8), and (b) provide as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with

- 9 -

an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but, under section 2511(b), the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa.

Super. 2008) (*en banc*). While the trial court focused its discussion on section 2511(a)(8) and (b), we will focus on subsection 2511(a)(2) and (b).[5]

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

> [Section] 2511(a)(2) provides [the] statutory ground[] for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> [The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> > A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> ***In re Adoption of J.J.***, 515 A.2d 883, 891 (Pa. 1986), *quoting* ***In re: William L.***, 383 A.2d 1228, 1239 (Pa. 1978).

---

[5] We note that the trial court stated that it focused its inquiry upon the needs and welfare of the Children under both section 2511(a) and (b). Trial Court Opinion, 5/7/15, at 7 n.37. The trial court, however, did not engage in a separate discussion of the needs and welfare of the Children under subsections (a)(2), (5), and (8), and (b). Rather, the court, which discussed only subsection (a)(8), intertwined its discussion of the considerations under subsection (a)(8) and (b), while stating that it engaged in the two-tiered analysis set forth in ***In re C.L.G.***, 956 A.2d at 1009. We will focus our discussion on subsection (a)(2), which does not have a needs and welfare element.

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

The trial court assessed the evidence regarding Mother's repeated incapacity to parent the Children, and her inability to remedy the conditions and causes of her incapacity to parent the Children as follows.

> Shortly after her sentencing[,] Mother was transferred from the County Prison to the State Correctional Institution at Muncy. She remained there for a short time until she was transferred to the State Correctional facility at Cambridge Spring[s,] where she will serve out the remainder of her sentence.

> Prior to her incarceration, Mother had several other run-ins with law enforcement. At least twice in 2011[,] police were called to her home as a result of drug overdoses by the men in her life. She was also convicted of various charges arising out of three separate criminal episodes in 2012. The convictions were for retail theft, possession of drug paraphernalia, and disorderly conduct.

> Mother lived with various men after the birth of S.O. They introduced her to drugs and subjected her to domestic violence. Mother admitted to experimenting with all sorts of drugs, including cocaine and heroin. However, she claimed that the drugs never "had control over (her) . . . like they did some of the people that (she) lived with." We found that claim to have been belied by the facts.

Since her incarceration[,] Mother has been cooperative with the Agency. She completed a drug and alcohol evaluation in February of 2014 at the County Prison. She also attended N.A. [Narcotics Anonymous] and A.A. [Alcoholics Anonymous] meetings while at the County Prison. After she transferred to Cambridge Springs in January 2015[,] she enrolled in both a parenting program and a domestic violence program. However, when she is released from prison, "there are many things that she still needs to complete in order for the Agency to feel comfortable recommending that the kids would return to her."

Trial Court Opinion, 5/7/15, at 2-4 (internal footnotes omitted).

Mother relies on *In re R.I.S.*, 36 A.3d 567, 574 (Pa. 2011) (plurality), to support her argument that incarceration alone is not an explicit basis upon which to base termination of parental rights. She quotes *R.I.S.* for the proposition that this Court must inquire whether the parent utilized those resources at his or her command while in prison to continue and pursue a close relationship with her children. Mother's Brief at 33, *quoting In re R.I.S.*, 36 A.3d at 572-573. Mother asserts that she has utilized the resources available to her to continue and pursue a relationship with the Children, and that she has exerted herself to maintain a place of importance in their lives. Mother's Brief at 33-34. Mother states that, while incarcerated, she has routinely sent letters including pictures and gifts, she has sent significant monetary child support, she regularly attempts phone calls to the foster parents, she has continued efforts to arrange for virtual visitation, and she has signed up for prison programs to address her problems and become a better parent. *Id.*

Recently, our Supreme Court instructed:

> we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 [Pa.C.S.A.] § 2511(a)(2). [**See In re: E.A.P.**, 944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

**In re Adoption of S.P.**, 47 A.3d at 830-831 (some internal citations omitted).

Here, the trial court recognized that Mother had utilized all of the resources available to her to maintain contact with the Children, but noted that Mother's contact with the Children had been limited because of her incarceration. Trial Court Opinion, 5/7/15, at 8. In view of our Supreme Court's decision in **In re S.P.**, the trial court was not bound by the Court's decision in **In re R.I.S.** to find insufficient evidence upon which to terminate Mother's parental rights simply because the trial court found that she had utilized her limited resources in prison to attempt to maintain contact with

the Children. The trial court considered that, even if Mother is released on parole in April of 2016, "when she is released from prison, 'there are many things that she still needs to complete in order for the Agency to feel comfortable recommending that the kids would return to her.'" Trial Court Opinion, 5/7/15, at 2, 4.

After a careful review of the evidence presented, we conclude that the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. Thus, we will not disturb the trial court's factual findings or its credibility determinations. *In re Adoption of S.P.*, 47 A.3d at 826-827.

Next, we review the termination of Mother's parental rights under section 2511(b). Our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

The trial court considered the needs and welfare of the Children, and set forth its bond-effect analysis, as follows:

- 15 -

When the [C]hildren were placed with the "F" family, S.O. was a little more than 33 months old[,] and T.A. was just over 5 months old. No services were necessary for T.A. However, that was not the case with S.O. When she came to the "F" family[,] she had been deeply affected by what she had endured in Mother's home. She was nervous and anxious, would bite her nails and pick her fingers until they bled, threw temper tantrums, and wet the bed.

S.O. began counselling with a play therapist in February of 2014. The therapist opined that her fear, anxiety and behaviors were the result of trauma. After observing her play, he concluded that her trauma was associated with a car as well as with two men. While she made great progress during her year in counselling, there were two periods of regression. Both periods coincided with her contacts with Mother. She expressed fear about living with Mother. She does not even want to talk about her [m]other. On the other hand, she feels very safe with and bonded to her foster family.

S.O. and T.A. are happy, healthy and very much a part of the "F" family. They live with R.F., [sic] S.F. and their 5 children, ages 20, 18, 16, 13, and 10. The entire family loves them.

Since T.A. was only 5 months old when he was placed, the "F" family is the only family he has ever really known. S.O. refers to R.F. and S.F. as mommy and daddy. She also says that she does not have any other mommy.

Trial Court Opinion, 5/7/15, at 4-5 (internal footnotes omitted).

With regard to its bond analysis, the trial court stated as follows.

Both children were placed with the "F" family on an emergency basis on October 3, 2013 because of Mother's incarceration. At the time we entered the order terminating her parental rights[,] she had been incarcerated and the [C]hildren had been in placement for more than 17 months. . . .

The [C]hildren will have been in placement for at least 30 months before Mother can hope to be released from prison. They are part of a family that loves them and wants to adopt them. Both [C]hildren have been with that family for a large

- 16 -

portion of their young lives. There is a mutual and loving bond between the [C]hildren and the family. T.A. has not known any other family. S.O. feels safe with the "F" family and does not wish to be with anyone else.

We commend Mother for having used all of the resources available to her to maintain contact with the [C]hildren. However, because of her incarceration[,] that contact has been limited. Due to the young age at which [T.A.] was placed, and the limited contact he has had with Mother during his placement, we saw no evidence that T.A. has any type of meaningful relationship with his [m]other. S.O., on the other hand, had been so traumatized by her years of living with Mother, the mere prospect of contact with Mother causes her fear and anxiety.

Based upon the totality of the circumstances, we were convinced that the needs and welfare of the [C]hildren would best be served by allowing them to be adopted by the "F" family. The adoption will give them the permanency they need and are entitled to have. They are in a safe, secure and loving environment where all of their physical and emotional needs are being met. T.A. is thriving and S.O. has made great progress in overcoming the trauma to which she had been subjected. For those reasons, we terminated Mother's parental rights to both [C]hildren.

Trial Court Opinion, 5/7/15, at 7-8 (internal footnote omitted).

We have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). It is

appropriate to consider a child's bond with her foster parent. *See In re: T.S.M.*, 71 A.3d at 268.

In addition, in *In re: T.S.M.*, our Supreme Court set forth the process for evaluation of the existing bonds between a parent and a child, and the necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home. The Supreme Court stated the following:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)] (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.
>
> [The Adoption and Safe Families Act of 1997, P.L. 105-89] ASFA[,] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.*, 9 A.3d at 1186; *In re Adoption of S.E.G.*, [901 A.2d 1017, 1019 (Pa. 2006)]. This drift was the unfortunate byproduct of the system's focus on

- 18 -

reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. ***See***, 42 Pa.C.S.A. § 6301(b)(1); 42 Pa.C.S.A. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

***In re: T.S.M.***, 71 A.3d at 268-269.

Mother testified that she loves the Children. N.T., 2/4/15, and 3/3/15, at 107. She contends that the trial court prematurely terminated her parental rights without affording her a chance to demonstrate her parenting skills upon her release from prison. A parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. Further, we stated in ***In re Z.P.***, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id.*** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004).

We find the trial court's analysis under section 2511(b) is supported by competent evidence in the record. The court's legal conclusions are not the result of an error of law or an abuse of discretion. Thus, we will not disturb

the trial court's factual findings or its credibility determinations. *In re Adoption of S.P.*, 47 A.3d at 826-827.

In her third issue, Mother relies on *In the Interest of: D.C.D.*, 91 A.3d 173, 179 (Pa. Super. 2014), to support her contention that the trial court abused its discretion and erred as a matter of law in terminating her parental rights when CYS failed to provide her with reasonable efforts to promote reunification between her and S.O. prior to filing the termination petition. Mother's Brief at 36. Our Supreme Court held, however, that the trial court is not required to consider reasonable efforts in relation to a decision to terminate parental rights under section 2511(a)(2). *In the Interest of: D.C.D.*, 105 A.3d 662, 675 (Pa. 2014). Thus, we find her argument lacks merit.

The trial court, nevertheless, concluded that CYS had made reasonable efforts to reunify the Children with Mother. The trial court stated:

> The record is clear that the Agency developed an appropriate plan[,] and did what it could to assist Mother in obtaining the recommended services. However, because of her incarceration[,] the available services were limited. Furthermore, there was no service available to remove the biggest impediment to reunification, *i.e.*[,] her incarceration.

Trial Court Opinion, 5/7/15, at 9.

Although a reasonable efforts inquiry is not an element to a termination decision under section 2511(a)(2), our review of the record shows that there is ample evidence to support the trial court's determination that CYS made reasonable efforts.

In her fourth issue, Mother contends that the trial court abused its discretion and erred as a matter of law in permitting Mr. Kauffman, who was admitted as an expert in play therapy, to opine, over her counsel's objection, that returning S.O. to Mother's home would be harmful to the child. Mother alleges that Mr. Kauffman's opinion was not supported by any expert report, and was based only upon his observations of the three-year-old child, S.O., during play therapy. Mother claims that, based on the lack of any other testimony presented by CYS regarding Mother's bond with S.O., it is clear that the trial court relied heavily on Mr. Kauffman's testimony.

Mother cites **Steele v. Shepperd**, 192 A.2d 397 (Pa. 1963), for the proposition that, where a witness possesses neither the experience nor education in the subject matter under investigation, he is incompetent to testify as an expert. Mother also cites **Childers v. Power Line Equip. Rentals**, 681 A.2d 201 (Pa. Super. 1996), for the proposition that an expert opinion based on mere possibilities is not competent evidence. Mother's Brief at 38.

In **Rittenhouse v. Hanks**, 777 A.2d 1113 (Pa. Super. 2001), a panel of this Court stated as follows:

> The standard for qualifying an expert witness is liberal; if the witness has any reasonable pretension to specialized knowledge on a subject, he may testify[,] and the weight to be given to the testimony is for the trier of fact. **Miller v. Brass Rail Tavern**, 664 A.2d 525 (Pa. 1995). Moreover, the qualification of an expert witness rests within the sound discretion of the trial judge, and, the decision of the trial judge should be upheld.

- 21 -

***Rittenhouse***, 777 A.2d at 1116, ***see also*** Pa.R.E. 702-705.

Mr. Kauffman testified that he had a master's degree in counseling psychology, and was employed by Family Resource and Counseling Centers, where he had been counseling S.O. for almost one year. N.T., 2/4/15, at 10-11. We observe that Mother's counsel challenged Mr. Kauffman's qualifications at the hearing, and he was permitted to question Mr. Kauffman about his background. Mr. Kauffman testified that he had been working with children for 15 years, mainly in the area of trauma, and had testified in 11 hearings, nine of them as an expert. ***Id.*** at 16-18. On the basis of ***Rittenhouse***, we find no error or abuse of the trial court's discretion in permitting Mr. Kauffman to testify as an expert in child therapy at the hearing.

Regarding the admission of evidence, our Court has instructed,

> Evidentiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law. In order to find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party. Appellant must therefore show error in the evidentiary ruling and resulting prejudice, thus constituting an abuse of discretion by the [trial] court.

***Whitaker v. Frankford Hospital***, 984 A.2d 512, 522 (Pa. Super. 2009) (internal citations and quotation marks omitted).

Here, the trial court explained that it allowed Mr. Kauffman to testify as to his opinion on whether S.O. "would suffer any negative emotional

impact if [the] parental rights [of Mother] were terminated." Trial Court Opinion, 5/7/15, at 9. The court allowed the testimony over the objection of Mother's counsel, because it found the opinion helpful to its analysis of S.O.'s needs and welfare. *Id.* On the basis of *Whitaker*, we find no error or abuse of discretion in the trial court's allowing Mr. Kauffman to offer his expert opinion on whether S.O. would suffer any negative impact if Mother's parental rights were terminated. In fact, the trial court could consider Mr. Kauffman's testimony on the harm that S.O. would suffer from the termination of Mother's parental rights without his being an expert. *See In re Z.P.*, 994 A.2d at 1121; *In re K.Z.S.*, 946 A.2d at 764.

In her related fifth and sixth issues, Mother contends that the trial court abused its discretion and erred as a matter of law in admitting, and considering as part of its termination decision, the reports prepared by the CASA, and the CASA's recommendation to terminate Mother's parental rights, over the objection of Mother's counsel. Mother's Brief at 40-42. Mother relies on *Commonwealth v. McLean*, 564 A.2d 216 (Pa. Super. 1989), for the proposition that a lay witness may not testify with regard to a legal conclusion. Mother's Brief at 41.

The trial court allowed the CASA to testify, over the objection of Mother's counsel that she was not an expert. N.T., 2/4/15, and 3/3/15, at 65. The CASA testified that the Children were happy in the F.'s home. *Id.* at 65. The CASA stated that, given the Children's ages and the length of

time they had been in the placement, she recommended termination of Mother's parental rights and a goal change to adoption, so that the F.'s could adopt them, and provide them permanency. *Id.* at 66. The CASA considered that Mother would not be able to parent the Children for at least another year. *Id.* The CASA also recommended that with the goal change to adoption, all visitation between Mother and the Children cease because of further anxiety to S.O. from interaction with Mother, and the lack of any bond between T.A. and Mother based on his young age. *Id.* at 66-67.

In its opinion, the trial court stated that, although the court admitted the reports of the CASA into evidence, the court did not consider the reports in rendering its decision. Further, the trial court stated that, "[a]s with [Mr. Kaufmann,] the play therapist, [the court] allowed the CASA volunteer to testify as to her recommendation to assist [the court] in assessing the needs and welfare analysis for the [C]hildren." Trial Court Opinion, 5/7/15, at 9. We find that Mother failed to demonstrate how the trial court's admission of the CASA's reports, which it did not consider, harmed her. *See Whitaker*, 19 A.3d at 1109. Moreover, we find that Mother failed to show how the trial court's admission of the CASA's recommendation as to permanency for the Children was an error of law or an abuse of discretion. *Id.* The CASA could offer testimony on the bond between the Children and Mother, and the F.'s, and whether the termination of Mother's parental rights would negatively

affect them without being qualified as an expert. ***In re Z.P.***, 994 A.2d at 1121.

In her final issue, Mother argues that the trial court abused its discretion and erred as a matter of law in denying further visits between Mother and the Children pending appellate review of the trial court's orders terminating Mother's parental rights.

The trial court explained its decision as follows.

> Mother's final allegation of error involves our refusal to continue visitation pending the appeal in this matter. As noted above[,] Mother has had only two contacts with S.O. in 17 months since she was incarcerated. Because of the effect those contacts had on the child, we halted further contacts until the prospect of seeing her [m]other no longer posed a grave risk of emotional harm for the child. The testimony of the play therapist [Mr. Kauffman] made it clear that such a grave risk still exists. In order to visit with T.A. in person[,] the child would have to endure a six[-]hour care ride to get to the prison at Cambridge Spring[s], and another six[-]hour car ride to return home. In all fairness, Mother has agreed to have any visitation by means of [S]kype or other virtual media. However, because of her prison transfers and the prison regulations, Mother has not had any contact with T.A. since September of last year. In view of our decision to terminate the parental rights, we did not feel that it would benefit the child to reinstate visitation either in person or through virtual means.

Trial Court Opinion, 5/7/15, at 10 (internal footnote omitted).

Mother complains that CYS has not offered or provided any reunification therapy between her and S.O. to alleviate the alleged "grave risk" to S.O. that Mr. Kauffman testified would exist from contact between Mother and S.O. Mother asserts that Mr. Kauffman's testimony regarding potential harm to S.O. based on visitation with Mother was based on his

unsubstantiated guess. Mother also asserts that the record does not support a conclusion that any harm could come to T.A. from continued virtual visitation and written correspondence with Mother during the pending appeal.

Mother fails to provide any in support for her contention that the trial court erred or abused its discretion in denying visitation. Mother is simply rehashing her arguments concerning reasonable efforts and the propriety of the testimony of Mr. Kauffman and the CASA. "[A]rguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." ***Lackner v. Glossner***, 892 A.2d 21, 29-30 (Pa. Super. 2006) (internal citations omitted). ***See also Chapman-Rolle v. Rolle***, 893 A.2d 770, 774 (Pa. Super. 2006) ("It is well settled that a failure to argue and cite to any authority supporting an argument constitutes a waiver of issues on appeal"). We, therefore, find that Mother has waived her argument concerning the visitation order.

Accordingly, we affirm the decrees and orders of the trial court involuntarily terminating Mother's parental rights to S.O. and T.A., and providing that CYS shall not provide visitation between Mother and the Children.

Decrees and orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/28/2015</u>