J-S42045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: W.R.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.B., MOTHER | No. 146 WDA 2016 |

Appeal from the Order January 5, 2016
in the Court of Common Pleas of Blair County Civil Division
at No(s): CP-7-DP-64-2013

BEFORE: SHOGAN, OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED SEPTEMBER 09, 2016**

S.B. ("Mother") appeals from the permanency review order dated and entered January 5, 2016, changing the permanency goal to adoption for her dependent, female child, W.R.B., ("Child") (born in February of 2012), and also changing the placement of Child by removing Child from the home of her legal custodian, D.B., who is Child's maternal great-grandmother ("MGG"). The trial court order also vested legal and physical custody to Blair County Children Youth and Families ("BCCYF").[1] We affirm.

The trial court set forth the factual background and procedural history of this appeal as follows.

> On April 21, 2015, Blair County Children Youth & Families (hereinafter "BCCYF") filed a Dependency Petition, alleging that the subject child, W.R.B., was a dependent child who was without proper care or control, under the

---

[*] Former Justice specially assigned to the Superior Court.

[1] Child's father, T.S. ("Father"), is not a party to this appeal, and has not filed a separate appeal of his own.

Juvenile Act, 42 Pa.C.S. §6302(1). In its Dependency Petition, BCCYF identified S.B. as the Mother, T.S. as the Father, and D.B., as the Maternal Great-Grandmother of the subject child. At the time of the filing of the Dependency Petition, the Mother and child were residing with D.B. [Dependency Petition, p. 5, No. 1.c.i.].

As set forth in the Allegations of Dependency,[1] BCCYF has a history with this family dating back to June 2012. The Agency received multiple reports that the Mother was involved in drug use; that the Mother had entered mental health treatment on October 16, 2012 due to superficially cutting herself approximately six hundred (600) hundred times; the Mother was arrested and placed at the Blair County Prison in late 2012 with the child being placed with the Maternal Great-Grandmother; and that upon the Mother's release from prison on February 25, 2013, a safety plan was put into effect stating that all contact between the Mother and child would be supervised by the Maternal Great-Grandmother, and that the Mother would not remove the child from D.B.'s residence. [D.P., pp. 5-6, No. 2].

During 2013, BCCYF received additional reports from a service provider, New Steps, who was providing in-home services, as to cluttered home conditions and the volatile relationship between S.B. and D.B. Further, it was reported by both New Steps and Pyramid Healthcare that the Mother was not attending her scheduled appointments. On June 20, 2013, the Mother tested positive for marijuana and amphetamines and was detained by her probation officer until December 2014.[2] [D.P., p. 6, No. 2. h.-j.].

The Mother also has a criminal history dating back to July 6, 2012, when she pled guilty to Simple Assault (M-2) for which she received probation. Due to numerous probation violations. she was detained in prison on at least four (4) separate occasions. On August 26, 2013, she

---

[2] The date is an apparent clerical error, and should be December 2013.

pled guilty to Retail Theft (M2) for which she received probation. [D.P., p. 6, No. 3.a.].

The Dependency Petition also sets forth the Father's criminal history dating back to February 2, 2011 when he pled guilty to Disorderly Conduct as a summary offense. In 2012, the Father pled guilty to Purchasing Alcoholic Beverage by Minor, Simple Assault and Recklessly Endangering Another Person. In 2013, he pled guilty to Criminal Mischief, Harassment and Retail Theft. In 2014, he pled guilty to Public Drunkenness and Theft by Unlawful Taking. On March 26, 2015, he pled guilty to Use/Possession of Drug Paraphernalia. [D.P., p. 6, No. 3.b.].

Relative to the case history giving rise to the most recent Dependency Petition that was filed on April 21, 2015, BCCYF received a report that the Mother was taking her child with her to [a] friend's residence while she smoke[d] marijuana. Following the report, a caseworker conducted a home visit on March 3, 2015[3] at D.B.'s residence[,] at which time the Mother admitted to smoking marijuana and that she could not understand "what the big deal is". When asked to take a drug screen, the Mother reported that she would also test positive for street Subutex. The Mother indicated that she takes Subutex to help her stay "clean" from pain pills and that she can get street Subutex for free. The drug screen was positive for Opiates, THC and Benzodiazepines. The Mother denied having a drug problem. A safety plan was put into effect on March 3, 2015 providing that D.B. would supervise all contact between the Mother and child. [D.P., pp. 6-7. No. 4.a.].

On March 16, 2015, during an office visit with the family, the Mother was offered an opportunity to participate in the Blair County Family Drug Court Program, which she refused. D.B. confirmed to the caseworker that the Mother was taking the child places and staying the

_____

[3] The date should be March 13, 2015. *See* Dependency Adjudication Pet., p. 1; N.T., 6/29/15, at 2-3.

night. Further, BCCYF alleged that the Father had been minimally involved with the child. (D.P., p. 7, No. 4.b.c.).

On May 13, 2015, BCCYF filed both an Application for Emergency Protective Custody and a Shelter Care Application. In each Application, BCCYF alleged that the subject child, W.R.B., was without proper care or control pursuant to The Juvenile Act, 42 Pa.C.S. §6302(1). . . . The Mother requested that the matter be waived to court. Since the voluntary safety plan was due to expire on May 13, 2015, and the Custody Order in effect did not prohibit unsupervised contact between the Mother and child, BCCYF filed its Applications. The Agency also reported that the Mother continued to test positive for illegal substances after the filing the Dependency Petition, and that the Mother continued to deny her drug use. Furthermore, the Mother discontinued her mental health treatment.

This Court granted emergency protective custody on May 13, 2015 to the Maternal Great-Grandmother, D.B., with the stipulation that the parents only have supervised contact with the child until the date of the Adjudicatory/Dispositional Hearing.

On May 15, 2015, a Shelter Care Hearing was held[,] after which an Order was entered finding that sufficient evidence was presented to prove that return of the child to the home of either parent was not in the child's best interest. Furthermore, the Master's Recommendation on May 22, 2015 (approved as an Order of Court on May 28, 2015) granted legal and physical custody of the child to D.B., and permitted only supervised contact for the parents.

The Adjudicatory/Dispositional Hearing was held on June 29, 2015, after which an **Order of Adjudication and Disposition – Child Dependent** was entered June 30, 2015 finding the child to be a dependent child.[4] Further, said Order continued legal and physical custody in D.B.,

_____

[4] Child was adjudicated dependent pursuant to 42 Pa.C.S. § 6302(1), as lacking proper parental care and control.

and established a goal of return home to one or both parents, with a concurrent goal of adoption. The court ordered the parents to invest in all recommended services, including but not limited to drug and alcohol, mental health and re-unification services, and to comply with all treatment recommendations. The Order also directed that each parent to undergo a mental health assessment and follow through with all treatment and counseling that would be recommended. The parents were ordered to maintain sobriety and establish and maintain stability relative to housing.

An **Amended Order of Adjudication Disposition - Child Dependent** was entered July 13, 2015.[2]

On September 22, 2015, a status conference was held. At the time of the status conference. the Mother had moved back into the residence with D.B., and, therefore, FICS Re-unification Services were transitioned to FICS Preservation Services. The Father was in the Cambria County Prison at the time.

On November 25, 2015, BCCYF filed its Motion for 6th Month Permanency/Dispositional Review Hearing/Goal Change. After hearing held December 15, 2015, a Permanency Review Order was entered January 5, 2016, changing the goal to adoption, and also removing the child from the home of D.B. Legal and physical custody was vested in BCCYF.

On January 13, 2016, the Mother, S.B., filed a Request for Reconsideration. On January 15, 2016, the Maternal Great-Grandmother, D.B., filed her Request for Reconsideration. Oral argument on said Requests for Reconsideration was held on January 29, 2016, after which an Order was entered February 2, 2016 denying and dismissing both Requests.

On January 13, 2016, the Mother filed a timely Notice of Appeal as a "children's fast track appeal", along with a Statement For Continuance Of In Forma Pauperis Status For Purposes Of Appeal (which was approved January 21, 2016); a Concise Statement of Errors Complained Of On Appeal; and a Request for Transcript of both the June 29,

2015 Adjudicatory Hearing and the December 12, 2015 Permanency Review Hearing.

On January 15, 2016, the Maternal Great-Grandmother, D.B., timely filed a Notice of Appeal, along with her Concise Statement of Errors Complaint of on Appeal and a Request for Transcript.

_____

[1] At the time of the Adjudicatory/Dispositional Hearing, all parties through their legal counsel stipulated that if called to testify, Agency witnesses would testify consistent with the information set forth in the Dependency Petition, although not necessary [sic] to the veracity of same. [**See Findings/Orders. #15(a)(2)** of 6/30/15 Adjudicatory Order].

[2] The Amended Order of July 13, 2015 was consistent with the prior Order of Adjudication – Child Dependent entered June 30, 2015, with the sole exception that we completed Section 5.(c)(i) - Placement in Kinship Care in the Amended Order.

Trial Ct. Op., 146 WDA 2016, 2/8/16, at 1-6.[5]

On appeal, Mother raises three issues, as follows:

I. Where a parent has shown progress in compliance with the permanency plan developed for a child and toward alleviating the circumstances which necessitated the original placement, was it premature to enter a goal change to adoption after just six months of dependency of the child?

II. Whether the testimony from Mother's probation officer about probation violations prior to dependency and from Mother regarding residential history prior to dependency

_____

[5] On March 28, 2016, MGG filed a petition to withdraw her appeal at Docket No. 145 WDA 2016. This Court ordered MGG's appeal discontinued on April 1, 2016.

were relevant to the dependency action, the goal change petition, and/or the change of placement of the child?

III. Where a child has resided with the maternal great-grandmother for the majority of her life and there was not sufficient evidence that the maternal great-grandmother could not ensure appropriate safety of the child, was it in the child's best interest to be removed from the home of the maternal great-grandmother?

Mother's Brief at 14.[6]

First, Mother argues that the trial court prematurely changed the permanency goal for Child to adoption, only six months after the dependency process was in place. Mother asserts that she had made progress in complying with the permanency plan and alleviating the circumstances that necessitated the placement. Mother states that she also indicated a willingness to continue with her progress. In her second issue, Mother claims that the trial court abused its discretion in allowing irrelevant evidence into the hearing. In particular, she contends that the trial court improperly relied on testimony from her probation officer regarding her probation violations committed prior to the time of Child's adjudication of dependency, as well as her history of residences before Child's adjudication as dependent. In her third issue, Mother argues that the trial court erred in removing Child from the care and control of MGG, as the evidence showed that MGG was the most stable influence in Child's young life. She asserts

_____

[6] Mother stated her issues somewhat differently in her concise statement. We, nevertheless, find them preserved for our review.

that Child has a good bond with MGG, and that removing Child from placement with MGG was not in Child's best interests.

Our Supreme Court set forth our standard of review for dependency cases as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Section 6302 of the Juvenile Act defines a "dependent child" as a child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. **A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk**[.]

42 Pa.C.S. § 6302(1) (emphasis added).

In *In re G., T.*, 845 A.2d 870 (Pa. Super. 2004), this Court clarified the definition of "dependent child" further.

> "The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available."

- 8 -

*Id.* at 872 (quotation marks and citation omitted); *see also In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010). Additionally, the "burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *In re G., T.*, 845 A.2d at 872 (citation omitted).

With regard to a dependent child, in *In re D.A.*, 801 A.2d 614 (Pa. Super. 2002) (*en banc*), this Court explained:

> [A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 617 (alteration in original and citation omitted).

Regarding the disposition of a dependent child, Sections 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Section 6351(e) of the Juvenile Act provides in pertinent part:

**(e) Permanency hearings.—**

(1) The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity. . . .

(2) If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as provided in paragraph (3).

42 Pa.C.S. § 6351(e)(1)-(2).

Section 6351(f) of the Juvenile Act prescribes the pertinent inquiry for

the reviewing court:

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

\* \* \*

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\* \* \*

- 11 -

**(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another planned permanent living arrangement which is approved by the court, the following shall apply:

(i) The child must be 16 years of age or older.

(ii) The county agency shall identify at least one significant connection with a supportive adult willing to be involved in the child's life as the child transitions to adulthood, or document that efforts have been made to identify a supportive adult.

(iii) The county agency shall document:

(A) A compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

(B) Its intensive, ongoing and, as of the date of the hearing, unsuccessful efforts to return the child to the child's parent, guardian or custodian or to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

(C) Its efforts to utilize search technology to find biological family members for the child.

(iv) The court shall:

(A) Ask the child about the desired permanency goal for the child.

(B) Make a judicial determination explaining why, as of the date of the hearing, another planned permanent living arrangement is the best permanency plan for the child.

(C) Provide compelling reasons why it continues not to be in the best interests of the child to return to the child's parent, guardian or custodian, be placed for adoption, be placed with a legal custodian or be placed with a fit and willing relative.

(D) Make findings that the significant connection is identified in the permanency plan or that efforts have been made to identify a supportive adult, if no one is currently identified.

**(f.2) Evidence.—**Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or

permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f)-(g).

In a change of goal proceeding, the best interests of the child—**not** the interests of the parent—must guide the trial court; the parent's rights are secondary to those of the child's. *In re A.K.*, 936 A.2d 528, 532-53 (Pa. Super. 2007). The burden is on the Agency to prove the change in goal would be in the child's best interests. *In re M.B.*, 674 A.2d 702, 704 (Pa. Super. 1996). In contrast, in a termination of parental rights proceeding, the focus is on the conduct of the parents under 23 Pa.C.S. § 2511. *Id.* at 705.

This Court has stated:

the focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency, and well-being of the child. The best interests of the child take precedence over all other considerations, including the conduct and the rights of the parent. . . . [W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors.

*In re A.K.*, 936 A.2d at 534 (citations omitted). In addition, the court should consider the bond between the child and the child's parents, foster parents, and siblings in determining the child's best interests. *In re H.V.*,

37 A.3d 588, 594-95 (Pa. Super. 2012). In *In re N.C.*, 909 A.2d 818 (Pa. Super. 2006), another goal change case, the trial court granted a goal change to adoption despite the fact that the mother had made substantial progress toward completing her permanency plan. *Id.* at 825. Notwithstanding the mother's substantial progress, this Court held that the extensive record supported the trial court's factual findings that the mother's parenting skills and judgment regarding her children's emotional well-being remained problematic. *Id.* at 826.

Regarding the placement of a child who has been adjudicated dependent, this Court has explained:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. *See In re Sweeney*, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of the Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." *In re E.F.V.*, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006).

Instantly, in considering Mother's issues, as set forth above, the trial court stated as follows.

- 15 -

In our Order for Adjudication and Disposition - Child Dependent entered June 30, 2015 (and our Amended Order entered July 13, 2015), we made the following specific Findings concerning the Mother:

BCCYF has been involved with the mother since June, 2012 relative to her parenting of [W.R.B.J, who is three (3) years of age. Most recently, the Agency received a report on 3/12/15 that the mother will take the child with her to friend's houses while she smokes marijuana. Following the report, the caseworker conducted a home visit on 3/13/15 at [D.B.'s] residence. The mother admitted to smoking marijuana, and then tested positive for opiates, THC and benzodiazepines. She admitted to taking street Suboxone as well. A safety plan was put into effect on 3/3/15 placing the child in the custody of the maternal great-grandmother, [D.B.], who is to supervise all contact between the mother and child. At the hearing held 6/29/15, [D.B.] confirmed that the mother goes from friend's house to friend's house and is out late and not conducting herself as a mother should. As a result of a physical confrontation that occurred between the mother and her father on Father's Day, [D.B.] requested that the mother vacate her residence. Therefore, at the present time, the mother does not have an established residence. The mother's last contact with the Agency was on 6/18/15.

The mother was unsuccessfully discharged from Dolminis due to missed appointments and while there, had four different positive drug screens. The Agency has recommended that she undergo a drug and alcohol assessment by the Blair County Drug & Alcohol Partnership. The Agency also recommended Family Drug Court, to which the mother adamantly refused to participate.

The mother indicates a desire to cooperate with FICS Preservation Services, however, there have been several "no shows" for meetings to date without adequate explanations being offered. Ashley Langston of FICS testified that based upon her

- 16 -

observations, [D.B.] is the primary caretaker of [W.R.B.]. She did express concern that [D.B.] has "enabled" the mother. We find merit in this concern. During her testimony, [D.B.] stated that she would re-consider [S.B.] returning to her home, but only if she maintained sobriety for a period of time. When asked to indicate for what period of time, she replied that she "would want her to be totally clean for a week or so". Clearly, with the significance of the mother's drug addiction, and her refusal/inability to acknowledge it, we agree with the Agency and service provider that the mother needs to demonstrate sobriety for a significantly longer period of time (e.g., 6 months) before the goal of reunification can become a reality. Based upon her discussions with the Agency, the mother does not recognize or appreciate the significance of her drug addiction and its impact on her ability to safely parent her very young child. The mother would also benefit from a mental health assessment and any treatment that may be recommended.

**[6/30/15 Adjudicatory Order, No. 1.(c)].**

We made the following Findings from our **January 5, 2016 Permanency Review Order:**

[T]he mother has not established any structure or stability in her life, and has never served in the primary caretaker role for her daughter. The mother's history with the Blair County Adult Parole & Probation Office dates back to 2012 [see history set forth in Petitioner's Exhibit 2]. Such history includes multiple parole/probation violations, including but not limited to positive tests for THC, opiates, K2, Suboxone, Amphetamines, Methadone, and Alcohol. In July, 2012, she was referred for in-patient treatment at Gaudenzia, but left against medical advice on 9/10/12. She was released from prison to in-patient at Pyramid on 12/21/12, only to report six days later she would rather be in jail than inpatient. Due to her parole/probation violations, she has been detained in prison on a number of occasions.

Most recently, the mother was on pre-trial bail supervision due to pending Criminal Conspiracy and Theft by Unlawful Taking charges. According to the testimony of Ashley Michelow of the Blair County Adult Probation Office, the mother reported for her in-take and drug screen on 11/17/15 and the following week, but failed to report the last two weeks. She has not kept the probation office informed as to her current address. She tested positive for Opiates, Benzodiazepines, THC and Methadone on 11/17/15; and voluntarily admitted to use of Opiates (Heroin) and THC on 11/24/15. As a result of these violations, the Commonwealth has filed a motion to revoke her bail which is scheduled for hearing on 12/18/15. The mother voluntarily reported to the Crisis Center on or about 12/1/15, but was initially denied admission. As a result, she engaged in self-injurious behavior (cutting herself), and then was admitted.

Officer Daniel Vasil of the Altoona Police Department testified concerning two separate incidents which occurred on 11/8/15 at the residence of the legal custodian, [D.B.]. The first dispatch was for a report of a domestic incident involving a knife. In summary, a dispute arose between [D.B.], the mother and her then-boyfriend, [A.M.S.]. The mother had [A.M.S.] stay over in the residence over [D.B.'s] objection and an argument ensued which resulted in [D.B.] grabbing a knife and [waving] it at [A.M.S.]. There was also vulgar name-calling between the parties. During her interview with the police, the mother claimed [D.B.] (her grandmother) was not competent and wanted the police to take [D.B.] to Crisis. During her interview, [D.B.] stated that she was afraid of both the mother and [A.M.S.]. After being advised by the police, [D.B.] applied for and received an emergency protective order against the mother (which she later dropped over the advice of the Agency caseworker).

The second incident that occurred on 11/8/15 happened approximately three hours later. Officer Vasil went to the home to serve the PFA, and

- 18 -

received a dispatch that there was a male with a knife threatening everyone. Upon arrival, the officer observed [A.M.S.] arguing with [R.M. and L.M.] (family members) and several other people. Officer Vasil performed a pat-down search of [A.M.S.] and discovered a knife matching the description he received from the witnesses. When Officer Vasil interviewed the mother, she refused to answer his questions and kept questioning why [A.M.S.] was in handcuffs. Officer Vasil subsequently discovered that the mother and [A.M.S.] had packed their belongings in vacating the residence (due to the PFA), but that they were attempting to steal items that belonged to [D.B.], including a safe which contained jewelry and checks, and a laptop computer. Officer Vasil also observed the mother and [A.M.S.] in possession of several items that constitute drug paraphernalia, therefore, he also arrested the mother. The mother, who [was] pregnant, complained of cramps. AMED was called and transported her to the hospital, where it was discovered that she had inserted a pill bottle into her vagina. Several criminal charges were filed against the mother, including Criminal Conspiracy, Theft by Unlawful Taking, Receiving Stolen Property, Possession of a Controlled Substance, Use/Possession of Drug Paraphernalia, and Access Device Fraud. Both the mother and [A.M.S.] admitted certain items of drug paraphernalia belonged to them.

[W.R.B.] was present within the home during the incidents of 11/8/15.

Suzi Brannock has been a registered nurse for twenty years, and is employed by the Pregnancy Care Center of UPMC-Altoona Hospital. She has been involved with the mother since 10/8/15 and confirmed that the mother [was] approximately sixteen weeks pregnant. She has had several discussions with the mother about the importance of not using illegal drugs during her pregnancy. The mother tested positive for Methadone, Marijuana, Opiates and Benzodiazepines during her second visit;

and then for Methadone, Marijuana, Opiates and Cocaine during her last visit in the week prior to the hearing. During her discussions, the mother stated that she felt it was "safer" using drugs during her pregnancy and that it helped her with her nausea. The mother had no contact with the Pregnancy Center during November.

Kristel Wisor of FICS Preservation Services opened with the mother and child on 9/9/15. FICS was originally opened during June and July, however, its services closed when the mother moved out of [D.B.'s] home and [W.R.B.] remained with her great-grandmother. Ms. Wisor noted that when the mother "was clear" and calm and positive, she did a better job parenting. Once she started her Methadone treatment, Ms. Wisor indicated that mother seemed "really out of it", nodding off and didn't interact with the child. Also, if the mother was agitated, her interaction with the child was not appropriate. There was an approximate two week period of time in September that the mother was doing well, however, that was short-lived. Between 9/9/15 and 11/8/15 (when the mother went to jail), she passed all drug tests, but Ms. Wisor acknowledged that these were not random screens and the mother knew she would be tested.

Ms. Wisor described the relationship between the mother and [D.B.] as "interesting", and indicated that it is difficult for [D.B.] to stand up to the mother. Ms. Wisor stated [W.R.B.] is a "spirited" child, and expressed concern for [D.B.] to care and control the child as she gets older.

Kendra Wheelden, the Agency caseworker, testified as to the mother's inability to establish and maintain stable housing. She also confirmed that [D.B.] stated that she didn't want the mother to be in her home and that she wanted to keep [W.R.B.] from all the drug activity, but then dropped the PFA versus the mother against the caseworker's advice. Ms. Wheelden testified that [D.B.] "enables" the mother and that when [D.B.] personally feels the

"mother is "doing better", she allows her to be around. The Agency is seeking a goal change to adoption and a modification of placement, seeking to place the child in a pre-adoptive home (which has been identified). Ms. Wheelden confirmed that the Agency's recommendations are not only based upon the recent events, but on the long history of this case. Such history includes the mother taking [W.R.B.] out of [D.B.'s] home and into various homes where there was on-going drug activity. The Agency feels that [D.B.] cannot control the situation with the mother, and that if this child remains with her great-grandmother, the mother will still essentially be the one "in control" and pose a potential safety risk to the child. Ms. Wheelden also testified that the Agency has exhausted all possible resources to assist this family. Despite those services, no progress has been made to eliminate the issues that led to Agency involvement.

The mother, [S.B.], testified and acknowledged the pending criminal charges and stated she is currently residing in the domestic abuse shelter. She admitted to self-injurious behavior in order to gain admission into the Crisis Center in early December. She is on a waiting list for Section 8 housing and looking for employment. She has a mental health diagnosis, and is in Methadone treatment at Discovery House. She believes she did well for approximately 3 to 4 months, but admitted that she has "slid back". According to her own testimony, it appears that the mother lived at at least five different residences between June 20 and late-July when she moved back in with [D.B.] until the 11/8/15 incident.

Relative to her relationship with [A.M.S.], the mother acknowledged that he stayed the night and came over other days and that his presence was a source of contention with [D.B.]. The mother also testified that [A.M.S.] was physically and emotionally abusive toward her, and that he forced her to sleep with men for drug money. She stated that [A.M.S.'s] friends were also using drugs. During one

incident, the mother said [A.M.S.] beat her up, knocked her out, and tried to kill her baby.

[1/5/16 Permanency Review Order, No. 3(a)(ii)].

**SUMMARY:**

In addressing the Concise Statement of Errors that the Mother raised on appeal, we considered the entire history that BCCYF has had with this family, dating back to June 2012. The issues that led to the Agency's initial involvement remain the issues today, i.e., the Mother's drug addiction; the Mother's refusal to acknowledge that she has a drug problem; the Mother's refusal to invest in necessary drug and alcohol treatment; the Mother's refusal to engage in mental health treatment; the Mother never serving in the primary caretaker role for her daughter; the Mother never establishing any structure or stability in her life; the Mother's involvement in criminal activity and inability to abide by the terms and conditions of her supervision; the Mother's questionable decisions relative to whom she associates; and the Mother's volatile relationship, at times, with the Maternal Great-Grandmother, D.B. We also believe that the testimony of the Mother's probation officer, Ashley Michelow, during the 6th Month Review Hearing held December 15, 2015 was highly relevant and probative. Ms. Michelow's testimony confirmed that the Mother tested positive for several different illegal drugs and failed to keep her probation officer informed as to her current residence. As a result, the Commonwealth moved to revoke her bail.

Finally, our January 5, 2016 Permanency Review Order set forth in detail the reasons why we removed the child from placement with D.B., the Maternal Great-Grandmother, as we outlined above. We also note the child's GAL supported our decision.

Therefore, we respectfully request your Honorable Superior Court of Pennsylvania to affirm our Permanency Review Order of January 5, 2016, including the goal change to adoption.

Trial Ct. Op., No. 146 WDA 2016, 2/8/16, at 1-14. For the reasons expressed by the trial court, we find no merit to Mother's contention that the trial court **prematurely** changed Child's permanency goal to adoption, in view of the ample evidence before the trial court that supported the goal change. *See In re N.C.*, 909 A.2d at 825-26 (holding record substantiated trial court's factual findings); *see also In re R.J.T.*, 9 A.3d at 1190 (holding appellate court required to accept trial court's findings of fact and credibility determinations when they are supported by the record).

Next, as to Mother's second issue, regarding whether the trial court improperly relied on irrelevant evidence, the question of whether to admit evidence is in the sound discretion of the trial court, and we review the decision under an abuse of discretion standard. *See A.J.B. v. M.P.B.*, 945 A.2d 744, 749 (Pa. Super. 2008).

> Evidentiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law. In order to find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party. Appellant must therefore show error in the evidentiary ruling and resulting prejudice, thus constituting an abuse of discretion by the lower court.

*Whitaker v. Frankford Hosp. of the City of Phila.*, 984 A.2d 512, 522 (Pa. Super. 2009) (citations and internal quotation marks omitted).

> Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "All

- 23 -

relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

*Jacobs v. Chatwani*, 922 A.2d 950, 963 (Pa. Super. 2007).

In the case before us, the concern before the trial court was Child's best interests and Mother's best interests were only secondary. *In re A.K.*, 936 A.2d at 532-33; *In re M.B.*, 674 A.2d at 704-705. Because the evidence of Mother's probation history and lack of a residence was relevant to Child's best interests, we discern no abuse of discretion. *See Whitaker*, 984 A.2d at 522; *Jacobs*, 922 A.2d at 963.

Finally, with regard to Mother's contention that the trial court abused its discretion in changing Child's placement from residing with MGG, we observe that MGG has withdrawn her appeal from the change in placement. In its opinion regarding MGG's appeal, the trial court stated as follows:

> In our January 5, 2016 Permanency Review Order, we made the following specific Findings concerning the Maternal Great-Grandmother, D.B.:
>
> > [D.B.] tends to the basic needs of the child. The concern of the Agency and the service providers, which we find to be a legitimate concern, is whether the maternal great- grandmother will make safe and appropriate decisions when it comes to the mother and allowing the mother access to the child. The mother has significant addiction and mental health issues and has never demonstrated a consistent willingness to engage in appropriate treatment for her co-occurring issues. Her life is chaotic, and she

- 24 -

has exposed the child to the culture of the illegal drug world. There are concrete examples of the maternal great-grandmother not being able to control situations involving the mother and/or making unwise decisions concerning the mother. One example would be the incidents of 11/8/15 set forth above and as testified to by Officer Vasil of the Altoona Police Department. The situation became so volatile and extreme that [D.B.] grabbed a knife and wielded it at [A.M.S.]. The child was present during both incidents on 11/8/15. A second example would be when [D.B.] decided to drop the PFA Order she had against the mother one day after being advised by the caseworker to keep the protective order in effect. The mother testified that if we continued custody with [D.B.], that she would abide by any court order directing that she have no contact. We do not accept this testimony as being credible.

Based upon the history of this case, we are satisfied that there will continue to be incidents and situations that will create an unhealthy environment for the child (who is only 3 1/2 years of age), and will expose her to circumstances that would certainly not be in her best interests and welfare. Another concern is a very practical concern, i.e., the maternal great-grandmother's age and health. [According to the Dependency Petition filed 5/13/15, [D.B.] was born 12/[--]/51, making her 64 years of age]. As Ms. Wisor testifed, [W.R.B.] is a very spirited and strong-willed child and at times, difficult to control. We have serious concern as to [D.B.'s] ability to maintain proper supervision and control of the child in the coming years. If and when [D.B.] is unable or incapable of doing so, what then? Who will be the resource for the child? The parents, neither of whom have demonstrated any ability or even a sincere willingness to achieve and maintain sobriety and structure and stability in their lives? The appropriate time to seek safety and permanency for this young child is the present.

Finally, we incorporate herein our FINDINGS OF FACT as set forth in our Order of Adjudication and

- 25 -

> Disposition - Child Dependent entered 6/30/15. In said Findings, we found merit in the testimony of Ashley Langston of FICS that based upon her observations, [D.B.] was the primary caretaker of [W.R.B.] and she expressed concern that [D.B.] enables the mother. We also found the following (p.2 of 5):
>
> "During her testimony, [D.B.] stated that she would re-consider [S.B.] returning to her home, but only if she maintained sobriety for a period of time. When asked to indicate for what period of time, she replied that she "would want her to be totally clean for a week or so." Clearly, with the significance of the mother's drug addiction, and her refusal/inability to acknowledge it, we agree with the Agency and service provider that the mother needs to demonstrate sobriety for a significantly longer period of time (e.g., 6 months) before the goal of reunification can become a reality."

Trial Ct. Op., 145 WDA 2016, 2/8/16, at 13-14.

After a careful review of the record, we find that the trial court's findings of fact and credibility assessments are supported by competent evidence of record that support the change in placement, vesting of legal and physical custody in BCCYF, and the change in permanency goal to adoption. In view of our deferential standard of review as set forth in *In re R.J.T.*, 9 A.3d at 1190, we cannot disturb the findings and credibility assessments of the trial court. *See also In re A.B.*, 19 A.3d 1084, 1093-94 (Pa. Super. 2011) (stating that this Court will not upset the juvenile court's credibility determinations). Accordingly, we affirm the trial court's order.

Order affirmed. Child's "Motion for Extension of Time in Which to File Documents" denied as moot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/2016